Donald F. FLEMING, Deidra A. Fleming, Lisa M. Maurer, Brian E. Rohrbough, Susan A. Petrone, Richard P. Petrone (individually), and Nicole M. Petrone, a minor child, by and through her father and next friend Richard P. Petrone, Plaintiffs,

v.

JEFFERSON COUNTY SCHOOL DISTRICT NO. R–1, a Colorado Quasi-Municipal Corporation, and Jon DeStefano, individually and in his official capacity, Defendants.

No. Civ.A. 99–D–1932.

United States District Court, D. Colorado.

Nov. 1, 2001.

Barry K. Arrington, Arrington & Associates, PC, Lakewood, CO, James P. Rouse, Sr., Rouse & Associates, P.C., Englewood, CO, for plaintiffs.

Alexander Halpern, W. Stuart Stuller, Caplan & Earnest, LLC, Boulder, CO, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

DANIEL, District Judge.

### I. *INTRODUCTION*

This case is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for an alleged violation of Plaintiffs' constitutional rights arising from Defendants' refusal to allow Plaintiffs to honor their slain children and/or friends in a public forum at Columbine High School by painting tiles that have a religious content and/or that have the date April 20, 1993. Plaintiffs seek declaratory and injunctive relief and their attorneys' fee.

Specifically, Plaintiffs seek: (1) declaratory and injunctive relief in connection with Defendants' alleged violation of the Free Speech Clause of the First Amendment; (2) declaratory and injunctive relief in connection with Defendants' alleged violation of Plaintiffs' free speech rights under the Colorado Constitution; (3) declaratory and injunctive relief in connection with Defendants' alleged violation of the Establishment Clause of the First Amendment; and (4) costs and attorneys fees under 42 U.S.C. § 1988. The injunctive relief sought by Plaintiffs is an order requiring Defendants to mount Plaintiffs' tiles that were painted and previously refused on the walls of Columbine High School. Plaintiffs also ask that Defendants be required to provide another tile

session whereby Plaintiffs can paint the tiles they were not allowed to paint, and for these new tiles to be mounted on the walls of Columbine High School.

Defendants filed a motion to dismiss the complaint, which the Court denied. The parties also filed cross motions for summary judgment, which the Court denied. After a five-day trial, the Court makes the following Findings of Fact, Conclusions of Law and Order.

## II. FINDINGS OF FACT

1. Plaintiffs Diedra A. Fleming (hereinafter referred to as "Mrs. Fleming") and Donald F. Fleming (hereinafter referred to as "Mr. Fleming") are residents of Jefferson County, Colorado. Their daughter, Kelly Fleming, was a student at Columbine High School (hereinafter referred to as "CHS").

2. Plaintiff Lisa M. Maurer (n/k/a Lisa Rohrbough) (hereinafter referred to as "Mrs. Rohrbough") was at the time of the tile painting which is the subject of this lawsuit a friend of Plaintiff Brian E. Rohrbough (hereinafter referred to as "Mr. Rohrbough") and was also a friend of Mr. Rohrbough's son, Daniel Rohrbough. Subsequent to the filing of this case, she married Mr. Rohrbough. Mr. Rohrbough is a resident of Jefferson County, Colorado. His son, Daniel Rohrbough, was a student at CHS.

3. Plaintiff Susan A. Petrone (hereinafter referred to as "Mrs. Petrone") was the mother of Daniel Rohrbough. Plaintiff Richard P. Petrone (hereinafter referred to as "Mr. Petrone"), is Mrs. Petrone's current husband. The Petrones are residents of Jefferson County, Colorado. Plaintiff Nicole M. Petrone (hereinafter referred to as "Ms. Petrone") was at all times pertinent hereto a minor child, a resident of Jefferson County, Colorado, and a student at CHS. Ms. Petrone was the step-sister of Daniel Rohrbough, and her father is Mr. Petrone.

4. CHS is located in Littleton, Colorado, in the Jefferson County School District R–1. CHS educates approximately 2000 students with a staff of 180 persons.

5. Defendant Jefferson County School District No. R–1 (hereinafter referred to as the "School District"), describes itself as a quasi-municipal corporation, and is a School District formed and organized pursuant to the laws of the state of Colorado. The School District operates numerous primary and secondary public schools in Jefferson County, Colorado. Among the schools operated by the School District is CHS.

6. Jon DeStefano (hereinafter individually referred to as "Mr. DeStefano"), Tori Merritts, David R. DiGiacomo, Debby Oberbeck, and Vince Chowdhury (hereinafter collectively referred to as the "School Board") were in April of 1999 and in the summer and the fall of 1999 the duly elected and acting School Board for the School District.[1] Mr. DeStefano, who is sued in his individual and his official capacity, was at all times material hereto the President of the School Board for the School District. Plaintiff asserts that Defendants Tori Merritts and Debby Oberbeck are sued in

---

1. Defendants David R. DiGiacomo and Vince Chowdhury were members of the School Board up to November 11, 1999 at which time they left the School Board. The parties have stipulated to the dismissal of Defendants DiGiacomo and Chowdhury from this lawsuit, and the Court previously entered an Order dismissing them. Further, to clarify the Com-

plaint, Defendant Jon DeStefano is sued in his individual and official capacities. Defendants Tori Merritts and Debby Oberbeck are sued in their official capacities only, not withstanding the designations in the caption of the Complaint. The distinction was made by the Plaintiffs based upon discovery in this case.

their official capacities only, notwithstanding the designations in the caption of the Complaint.

7. Daniel Rohrbough and Kelly Fleming were students at CHS in April of 1999.

8. On April 20, 1999, two CHS students, Eric Harris and Dylan Klebold, entered the premises of CHS and shot numerous students and teachers before committing suicide. Twelve students and one teacher were killed by the gunmen, including Daniel Rohrbough and Kelly Fleming. In addition, twenty-six other students were injured, some quite seriously.

9. Prior to the April 20, 1999 shootings at CHS, students had engaged in what has become known as the "tile project". The tile project consisted of the painting and preparation of ceramic tiles measuring approximately four inches by four inches. The finished tiles were placed on the walls of the school hallways, initially in the art wing and the main hallways. They were put up as a border strip five and one-half (5½) feet off the ground above the lockers.

10. The practice of painting ceramic tiles and affixing them as decorations on the walls at CHS began with a proposal made to the school administration in the fall of 1996 by two art teachers, Erin Yust–Brown and Barbara Hirokawa (hereinafter referred to as "Ms. Hirokawa").

11. The tile project was approved and glaze colors for decorating the tiles were prescribed. As initially implemented by the art teachers, tile decorations had to be abstract or nonobjective with no symbols or words. Tiles that did not comply with the guidelines as set by the art teachers or tiles which the teachers considered inappropriate or simply unattractive were washed off prior to glazing and reused.

12. The tiles drew the attention of teachers from other departments who also wished to brighten the appearance of the hallways outside their classrooms. As other classes began making tiles under the supervision of non-art teachers, some tiles began to include recognizable images related to the content of the classes, such as frogs, bugs, volcanoes, and lightning for earth science.

13. There was no requirement for artistic merit or ability in order to participate in this particular tile painting activity. There were approximately one hundred and fifty (150) tiles painted in connection with the above project.

14. Subsequent to the April 20, 1999 shootings at CHS, the Jefferson County Sheriff's Department sealed the school building with the students' personal belongings and the school's instructional materials inside. The student body from CHS attended classes at Chatfield High School.

15. The CHS students continued to paint tiles at Chatfield under the direction of teaching assistants outside the regular Columbine staff and parent helpers. The painting was done by the science department, which continued to paint recognizable subjects. Further, other CHS students attending Chatfield were allowed to paint tiles. The tiles which were painted contained Columbine ribbons (blue and silver ribbons in a loop in memory of those who died and were wounded), initials, Columbine flowers, tears, and broken hearts. About 1,000 tiles were done by students while attending Chatfield.

16. In June, 1999, the School District determined that the CHS building should be renovated and reopened. The prospect of reintroducing the students to the CHS building posed significant mental health challenges. School officials made a concerted effort to change the appearance of the building to avoid incorporating sensory

cues that could reactivate memories of the attack.

17. In the summer of 1999, the tiles painted at Chatfield High School were installed in the hallways of CHS. These tiles were installed down the two north-south hallways at CHS.

18. In June or early July 1999, CHS librarian Elizabeth Keating (hereinafter referred to as "Ms. Keating") and Ms. Hirokawa proposed tile painting as an activity to assist in community healing by allowing the community to "retake" the school by participating in its restoration. They obtained approval from Barbara Monseu (hereinafter referred to as "Ms. Monseu"). Ms. Monseu was the area administrator responsible for three high schools (including CHS and Chatfield) and their feeder schools. Ms. Monseu was also the School Board's designated liaison to the families of shooting victims.

19. Thus, during the summer of 1999, the tile project continued, although the purpose of the project and the persons allowed to participate in the project changed from what the project had been before. Specifically, the purpose of the project changed from a student project supervised by teachers to a community healing process whereby certain members of the general public that included students, families and friends of students, alumni, rescue workers, health care professionals who treated the injured and other members of the community who were invited to express themselves regarding the shootings as part of the healing process. This was testified to by Ms. Monseu, Frank DeAngelis, and Ms. Keating.

20. This modified tile project which began in the summer of 1999 is the tile project at issue and which is referred to subsequently in the Findings of Fact and Conclusions of Law.

21. A School District press release announcing the modified tile project as it related to CHS students said that "this new project will serve two purposes. 'Students will have another opportunity to come into the school and become more comfortable with the surroundings. By participating in creating the tile art, they will also be a part of the reconstruction of their school.'" Plaintiffs' Exhibit 6.

22. Ms. Monseu's primary concern with the continued tile project was that nothing be placed in the building that would be harmful to the students. She consulted with other members of the CHS response team, including persons coordinating mental health efforts. To assure that the interior of the building would remain a positive learning environment and not become a memorial to the tragedy, Ms. Monseu directed that there could be no references to the attack, to the date of the attack, April 20, 1999 or 4/20/93, no names or initials of students, no Columbine ribbons, no religious symbols, and nothing obscene or offensive.

23. Plaintiffs' Exhibit 8 is Ms. Monseu's handwritten notes outlining the restrictions on content for tiles painted in the summer of 1999. The notes say, "The following guidelines will be used to determine which tiles will be hung in Columbine High School" and that "[t]iles which do not fit within these parameters will not be hung and can be claimed by the person who made the tile." *Id.* These guidelines were discussed with the CHS principal, assistant principal, administrators, the School District superintendent, deputy superintendent and others prior to approval of the tile painting project in the summer of 1999.

24. The School Board was also advised of the tile project to take place in the summer of 1999 and the guidelines on content restriction. The president of the

School Board, Mr. DeStefano, heard about the project in a briefing from the School District Superintendent. Mr. DeStefano also told the other members of the Board about the tile project. Mr. DeStefano admitted that it was the "strong consensus of the Board" that there be no religious symbols on the tiles displayed in the school. Further, Mr. DeStefano told the Petrones and Rohrboughs that he "personally had a problem with religious symbols" on the tiles and that it was Board policy to have no religious symbols of any kind in the school building.

25. Ms. Monseu testified that she told the persons with whom she discussed the tile project and guidelines that "this is a project outside of the school, this is a separate project, but we're trying to keep track of what's going on, not necessarily control everything, but keep track of what's going on."

26. The first tile painting activity was held at CHS on or about July 19, 1999. Two sessions were held on that day. The sessions were led by Ms. Hirokawa, Ms. Keating, and art teacher Pua Warnke (hereinafter referred to as "Ms. Warnke").

27. In the morning of July 19, 1999, CHS students, CHS graduates from the 1998–1999 school year, and incoming freshmen were allowed to paint tiles. Brothers and sisters of CHS students and incoming freshmen were also there and were allowed to paint tiles. One of the art teachers did a tile with her infant daughter. This tile painting session included opportunities for the media to be present.

28. In the afternoon of July 19, 1999, the victims and families of the April 20, 1999, shooting victims were allowed to paint tiles without any media being present. The victims and families were accompanied by other persons, including friends of the family. Photographs of the tile painting sessions were taken and admitted into evidence as Plaintiffs' Exhibit 10.

29. Participants in the tile painting project on July 19, 1999, were informed generally of the guidelines for tile content, and were told the tiles were not to be a memorial to the attack upon the school. A table was set up at the entrance with examples and posters of acceptable tile designs. However, no written guidelines were provided, nor were any instructions provided as to specific symbols that were forbidden as religious expression.

30. Some participants painted tiles that were inconsistent with the guidelines. Ms. Hirokawa and Ms. Warnke tried to screen and pull those tiles before they were sent to be fired. The volume of tiles produced, however, made it impossible to review each tile. Some tiles that were inconsistent with the guidelines were covered with an opaque glaze before the teachers were able to review them, and were sent out to be fired.

31. Upon their arrival at the school on the afternoon of July 19th, certain of the Plaintiffs were given personal instructions by one of the teachers concerning the project, including the guidelines on contents. These Plaintiffs were upset that they would not be able to express themselves in the manner that they saw fit and objected. Some of the Plaintiffs insisted that they be allowed to ignore the guidelines. Not wishing to come into conflict with parents of murdered students, the teachers accommodated some of the Plaintiffs by permitting them to paint what they wished, but informed them that tiles that were inconsistent with the guidelines would be fired separately and would not be affixed to the walls, but would be given to them for their personal use. Other Plaintiffs did not get to paint the tiles they wished to paint.

32. Specifically, at the July 1999 tile session, Mrs. Petrone had planned to paint

a tile with a heart and a cross and her son's name at the bottom. In spite of the instructions by the teachers to the contrary, she painted the tile she had planned. *See* Plaintiffs' Exhibit 2. This tile was not mounted on the walls of CHS.

33. Mr. Petrone made two tiles at the July session. *See id.* One was a "stick man" with Daniel Rohrbough's name. The other tile was divided by a "cross" into four grids, with the letters L O V E, one in each grid. There was a peace sign painted in the "O". These tiles were not mounted on the walls of CHS.

34. Ms. Petrone painted a tile at the July tile session in memory of her step-brother, Daniel Rohrbough. Her tile contained a rose, a heart, a yellow cross in between the heart and stem of the rose, and the words "Danny Rohrbough". *See id.* This tile was not mounted on the walls of CHS.

35. Mr. Rohrbough was told by librarian Ms. Keating at the July tile session that he could not paint tiles with religious symbols. He responded to her that he was invited here because his son was killed right outside that window. Mr. Rohrbough painted two tiles. One had a yellow background with 13 crosses painted in red. *See* Plaintiffs' Exhibit 1. The second one contained a Bible verse which says, "There is no peace says the Lord for the wicked". *See id.* Underneath this verse it says "Dan Rohrbough". Mr. Rohrbough believed when he painted the tiles that they would be fired with the rest of the tiles and placed randomly in the school hallways. However, these tiles were not mounted on the walls of CHS.

36. Mrs. Rohrbough (now Lisa Maurer) also painted two tiles at the July tile session. One of them said, "Jesus Christ is Lord" with the initials "D.R." *See id.* The other tile contained a cross dividing the tile into four quadrants, one quadrant

containing a heart, one a fish symbol, one a small hill with three crosses and one containing the initials "D.R.". *Id.* The "D.R." initials on both tiles stood for Daniel Rohrbough. These tiles were not mounted on the walls of CHS.

37. Mrs. Rohrbough testified that the only reason she was invited to paint a tile was because of her connection to Daniel Rohrbough. She had nothing to do with CHS other than her relationship with Daniel Rohrbough.

38. Mrs. Fleming also went to the first tile painting session in July, 1999. She found out from people around her that you couldn't put dates, names, religious symbols, or the Columbine ribbon on the tiles. Mrs. Fleming had wanted to paint a tile with "4/20/99" and "Jesus Wept" on it. She testified that she was deflated and crushed when she could not paint her tile. She painted another tile with a peace sign and a dove and one with a tree. According to Ms. Fleming's testimony, an art teacher told her to put her name on it and "we'll get it up."

39. In addition to the July 19, 1999, tile painting session, a subsequent tile painting session was held at CHS in August of 1999. Persons invited to paint tiles at that session included rescue workers, families of injured and deceased victims, police, firemen, ambulance attendants, and workers at area hospital emergency rooms, all of whom had been involved in some way with the events on April 20, 1999. Hundreds of people painted tiles at that session.

40. Mr. Fleming went to that second tile painting session. He learned of the restrictions that had been imposed through what his wife had told him. As a result of the restrictions, he painted a tile with a green alien. However, he had also wanted to paint a tile that said, "4/20/99"

and "Jesus Wept". Mr. Fleming testified that he and his wife thought that this was the most appropriate tile for the feelings they had for their murdered daughter. Mr. Fleming testified that he felt he was stabbed in the heart and was offended when he couldn't paint the tile he wanted to paint.

41. In addition, there was also a tile painting session held in August of 1999 at the class reunion for the CHS class of 1989. Anyone who attended that reunion could paint a tile, regardless of their connection with CHS.

42. In conformance with the guidelines imposed by area administrator Ms. Monseu, persons who were invited to the various tile painting sessions were generally told of the restrictions, including the ban on any religious symbols and the date of the shooting. However, no written guidelines were ever provided.

43. Further, the teachers in charge of the tile paintings were not given written guidelines or a list of symbols that were prohibited. No announcements or written guidelines were posted either.

44. The tiles and supplies that were used in the tile project after the April 20, 1999, shootings did not come from funds appropriated by the School District. Instead, according to a Stipulation found at Plaintiffs' Exhibit 14, the tiles and supplies were paid for by private donations received by the Jefferson Foundation and the Columbine Memorial Account.

45. Specifically, Plaintiffs' Exhibit 14 states that "The Jefferson Foundation is a private foundation which was organized exclusively for educational and charitable purposes to provide cooperation and support for the Jefferson County School District R–1" and that "Following the April 20, 1999, attack on Columbine High School, the Foundation received donations ear-

marked for Columbine High." Deposition Exhibits 20 and 21 were received into evidence that detailed all moneys received by the Jefferson Foundation for CHS as of September 29, 1999, as well as the income and expenditures for the CHS fund. Exhibit 14 states, "Out of the Columbine High School Fund The Jefferson Foundation expended the sum of $2,038.82 to pay for the tile project subsequent to the April 29, 1999, shootings...." The Jefferson Foundation paid this sum directly to the vendors who provided the supplies to the tile project after April 20, 1999. Exhibit 14 also states that "Additional funding for the tile project in the amount of $195.05, was provided through the principal's discretionary fund, a subaccount of the Columbine Memorial Account that was funded through donations to be used at the school's discretion." Exhibit 14 concludes, "The source of funds received for Columbine High School subsequent to the shootings, and hence the source of funds used to pay for the tile project, was private donations to be used at the discretion of the high school's administrators."

46. After the tiles were fired and shortly before the school year was to begin, Ms. Keating organized parent volunteers to affix them to the walls. She instructed them that if any tile was questionable or inappropriate, it was to be set aside. Ms. Keating left the decision as to what was inappropriate to the volunteers, believing that the art teachers previously had screened the tiles. Some tiles were screened out at this point, but Ms. Keating was unable to supervise on a tile-by-tile basis.

47. Shortly before the CHS building was to be opened, Ms. Monseu inspected the building and noticed that there were tiles on the wall that did not comply with the guidelines. Ms. Monseu noticed three or four tiles that were objectionable. One

had Danny Rohrbough's name on it, one had a scripture, and a couple tiles had crosses.

48. Ms. Monseu immediately met with Principal Frank DeAngelis and Assistant Principal Pat Patrick (hereinafter referred to as "Ms. Patrick"), instructed Ms. Patrick on the guidelines, and directed her to remove any tiles that included the date April 20 or 4–20, names or initials, tiles that were personalized, and tiles that had a religious connotation. Ms. Monseu left the definition of what constituted a "religious connotation" to Ms. Patrick's judgment and provided no specific guidelines about this. Ms. Monseu stated that Ms. Patrick and other staff members who assisted her were to look at each tile and decide on a tile by tile basis what was too religious to be placed on the walls at CHS.

49. In response to Ms. Monseu's directives, Ms. Patrick and other staff members walked the halls of CHS to identify "inappropriate" tiles, marked the tiles with a sticky note and had the custodian help with their removal. The search for tiles was done over a week long period, and after tiles were pulled down, she still saw some that she had missed.

50. To the extent possible, Ms. Patrick examined each and every tile that had been put up to see if it was "appropriate". Ms. Patrick removed tiles with crosses, the "Jewish star", and angels, the blue Columbine ribbon, the date "4–20", and tiles with initials and/or names on them, such as a tile with the initials "DK" incorporated into the design (thought to represent the initials of Dylan Klebold). Other tiles that were deemed inappropriate were also removed, such as a tile with the anarchy symbol, tiles with gang graffiti, a tile depicting a face with blood dripping from the temple, and tiles that Ms. Patrick believed may have incorporated symbols with a meaning discernible only to juveniles hop-ing to get away with something. Ms. Patrick removed a tile mural created by Ms. Warnke because it included her name. She removed a tile mural created by art teacher Erin Yust–Brown because its red colors were disturbing to some people. In total, Ms. Patrick testified that she removed approximately 80–90 tiles out of approximately 2100 tiles that had been put up.

51. The School District superintendent and the School Board knew that "inappropriate" tiles had been put up and would be taken down.

52. Tiles that were taken down had plain tiles put back up in their places. The contractors working in the school used their own blank tiles to fill in the holes left by the removal of "inappropriate" tiles.

53. Subsequent to encountering problems with being allowed to paint tiles with religious symbols and the removal of "inappropriate" tiles, the Plaintiffs and parents of other victims had a meeting with Ms. Monseu at which objections regarding the tile project were discussed. At that meeting, Ms. Monseu said that tiles with religious symbols would not be put up.

54. Subsequent to this first meeting, a second meeting was held between Plaintiffs, families of victims, and Ms. Monseu on or about September 9, 1999. At that meeting, Ms. Monseu relaxed the restrictions that had previously been imposed, telling the families of the victims that they could paint tiles with their children's names, initials, dates other than 4–20, and the Columbine ribbon, that is, anything but religious symbols, the date of the shooting, or anything obscene or offensive. Ms. Monseu further stated that these tiles would be put up in the school. Plaintiffs' Exhibit 9 is Barbara Monseu's notes of that second parent meeting and the

change in policy by the School Board that this meeting represented.

55. The Plaintiffs testified that none of them actually went to the school to repaint any tiles after this change of policy occurred because they had made their expressions previously or been denied the opportunity to paint the tiles they wanted to paint.

56. Witnesses for the Defendants testified that the reason the restrictions regarding names, initials, the date of the shooting, and religious symbols were necessary was to remove all reminders of he shooting from the hallways of CHS in order to prevent returning students from being traumatized. Further, witnesses for the Defendants testified that the restrictions on the tiles were designed to prevent the tile project from becoming a memorial to the victims of the shooting.

57. However, after the shooting CHS received numerous plaques, memorials, legislative resolutions, etc. *See* Plaintiff's Exhibit 3. These were placed in the administrative offices and/or other places inside CHS which the students have access to. These include a framed poster that stated "God Wept Over Columbine This Day, April 20, 1999", a plaque that said "IN HONOR OF THOSE THAT LOST THEIR LIVES OR THOSE THAT HAD THEIR LIVES CHANGED FOREVER ON APRIL 20, 1999", a framed picture which contained victim Lauren Townsend's sports jersey, photos and a Columbine ribbon, and a memorial plaque in honor of Lauren Townsend. In addition, the School District allowed Rebel Corner, a student store near the commons area of the school, to sell caps memorializing the victims of the shooting.

58. The School District itself allowed a display case near what was the entry way to the library where 10 students were slain. *See* Plaintiff's Exhibit 4 The display case contained the "Columbine Hands" statue, which was a prototype for a proposed permanent memorial to the Columbine victims made by a local artist. There was also a "We are Columbine" teddy bear designed by a student at CHS who was shot on April 20, 1999 and her sister. The teddy bear was taken on a space shuttle flight. A memorial plaque in the display case was donated after the shuttle flight. The display case also contained a framed plaque with the words "In Loving Memory" and the photographs of Daniel Mauser and Rachel Scott, two of the students killed in the shooting. This same plaque contained Columbine ribbons, a remembrance of the victims of the shooting, in each of the upper corners of the plaque. Finally, a sandstone memorial to slain teacher Dave Sanders was installed at the entrance to the school's baseball field. *See* Plaintiffs' Exhibit 5. The memorial contains the words, "for the eternal memory of Dave Sanders—Summer 1999". *Id.*

59. Witnesses for the Defendants also testified that the reason that religious symbols were prohibited was that the School District did not want religious symbols in any of its schools. Ms. Monseu testified that the reason religious symbols were not permitted was so that the School would not advocate for or against a particular religion.

60. However, the hallways in the art wing of CHS contained several mobiles sent to the school from Fort Collins High School which had references to God, crosses, and other items with religious connotations. *See* Plaintiffs' Exhibit 3, Photos 224–238. No one objected to the presence of the mobiles in the school, in spite of the religious symbols. There is also a line of photographs at the top of the walls in the art hallways which is purported to be the history of art. It contains many pictures with religious objects. No administrators

told Ms. Hirokawa, the head of the CHS art department, to take down the depiction of religious symbols in this history of art.

61. The Defendants' representatives who testified stated that there had never been any problems with religious symbols in the school, religious clothing, sectarian violence, or anything of that nature. The tiles never caused any controversy prior to the ban on religious symbols. Religious T–shirts and jewelry were allowed. Further, Ms. Monseu testified that the ban on religious symbols was not based upon any fear that the symbols would cause polarization or any type of harassment problems at CHS.

62. After commencement of this litigation, Plaintiffs photographed the hallways of CHS. Those photographs, depicting the hallways, the tiles and other items in the hallways, are contained in Plaintiffs' Exhibit 3. The photographs show that there were numerous non-abstract tiles that were put up on the walls, including tiles with names, initials, and messages. (Ex. 3, photograph # 's 29, 39–42, 51, 53, 61–65, 67–71, 76, 78–80, 82, 84, 86, 89, 99, 101, 105, 109, 119, 120, 123, 125, 127–132, 143, 148, 152, 153, 157, 160, 165, 174, 175, 186 & 201; see also photograph # 's 58–60, 71, 74, 75, 77, 78, 85, 90, 102, 119, 173, 194 & 200). There are tiles with fish, but not the "Christian fish". (Ex. 3, photo # 's 19, 24, 124, 126, 149, 158, 159, 166, 172, 205 & 206). There is a tile with the initials "MK # 70" which appears to be a memorial to student Matthew Kechter who was slain at CHS on April 20, 1999. (Ex. 3, photo # 139).

## III. CONCLUSIONS OF LAW

A. *The Alleged Violation of the Free Speech Clause of the First Amendment to the United States Constitution (First Claim for Relief)*

1. I first address the alleged violation of the Free Speech Clause of the First Amendment asserted in Plaintiffs' first claim for relief. A three-step framework is used when analyzing restrictions on private speech on government property. *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also Wells v. City and County of Denver,* 257 F.3d 1132, 1138–39 (10th Cir.2001), *cert. denied,* 70 U.S.L.W. 3246 (Oct. 29, 2001). First, the Court must decide whether the speech at issue is protected by the First Amendment. *Cornelius,* 473 U.S. at 797, 105 S.Ct. 3439. If so, I must then "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* Third, I "must assess whether the justifications for exclusion from the relevant forum satisfy the relevant standard". *Id.* Stated differently, I must determine whether a content-neutral restriction can survive strict scrutiny, whether a content-neutral restriction is a valid regulation of the time, place, or manner of speech, or whether a restriction on a nonpublic forum is reasonable." *Wells,* 257 F.3d at 1139.

2. When the government is the speaker, however, " 'different principles' apply." *Wells,* 257 F.3d at 1139 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). "When the government speaks, either directly or through intermediaries, it is constitutionally entitled to make 'content-based choices,' . . . and to engage in 'viewpoint-based . . . decisions' ". *Id.* (quoting *Legal Serv. Corp. v. Velazquez,* 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001)). Thus, the "analysis of restrictions that arise in the context of government speech is 'altogether different' than the analysis set forth in *Cornelius.*" *Id.* (quoting *Bd. of Regents of Univ.*

*of Wisc. Sys. v. Southworth,* 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000)). Thus, the Court must determine before it proceeds to the forum analysis whether the tile painting project was "government speech".

■ 3. I must also determine whether the speech was school-sponsored or was speech that "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" as discussed in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Under *Hazelwood,* school officials may exercise control over "school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562. Legitimate pedagogical concerns include the "emotional maturity of the intended audience", speech that is "inconsistent with 'the shared values of a civilized social order'", and speech that "associate[s] the school with any position other than neutrality on matters of public controversy." *Id.* at 272, 108 S.Ct. 562 (quoting *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)).

■ 4. With that legal backdrop in mind, I first find that the tile painting activities of the Plaintiffs constitute protected speech. "[T]he Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). "[P]ictures, films, paintings, drawings, and engravings ... have First Amendment protection...." *Kaplan v. California,* 413 U.S. 115, 119–120, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). I find that the tiles in this case are analogous to paintings and other types of symbolic expression that are recognized speech protected by the First Amendment.

■ 5. Further, in connection with the religious aspects of the tiles, I find that religious speech and speech from a religious viewpoint are protected by the First Amendment. *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1278 (10th Cir.), *cert. denied,* 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). "[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Thus, the religious content of some of the tiles at issue is also protected speech under the First Amendment.

■ 6. I now turn to the question of whether the tile painting activities constitute government speech, since that will determine whether the forum analysis is even applicable. Defendants argue that the speech was government speech by the School District because the District was responsible for the appearance of the interior hallways of CHS and exercised control over the tile painting project and the mounting of tiles on the hallway walls. Defendants thus assert that they did not open a forum of any sort, and that they could exercise content-based choices as to the tiles to be placed on the walls. Defendants argue that "[t]he Plaintiffs were no more at liberty to disregard their instructions as to what the hallways should look like than a contractor could ignore construction specifications." Proposed Conclusions of Law, p. 9.

7. Defendants rely on the Tenth Circuit's decision in *Wells* in arguing that the tile project was government speech. *Wells* dealt with a challenge to aspects of a holiday display at the City and County Build-

ing in Denver. The plaintiffs wrote a letter to defendant John Hall, the Director of Public Office Buildings for the City and County of Denver, requesting permission to place a sign inside the particular year's display. The letter quoted the text of the proposed sign called "Winter Solstice" which indicated, "There are no gods, no devils, no angels, no heaven or hell", "[t]here is only our natural world", "THE 'CHRIST CHILD' IS A RELIGIOUS MYTH", "THE CITY OF DENVER SHOULD NOT PROMOTE RELIGION" as well as other things. *See id.*, 257 F.3d at 1137. When the City didn't respond to the letter, the plaintiffs posted the sign as part of the display and the City subsequently removed it.

8. The Tenth Circuit found that the City and County of Denver was the speaker regarding the holiday display rather than corporate sponsors listed on a sign in the display. In making this decision, *Wells* discussed four pertinent factors to consider in determining whether government speech is implicated. These factors are: (1) that "the central purpose of the ... [speech at issue] is not to promote the views of the [private speakers]; (2) that the [government] exercised editorial control over the content of [the speech at issue]; (3) that the literal speaker was a [government] employee, not [a private speaker]; and (4) that ultimate responsibility for the contents of [the speech] rested with [the government], not [the private speaker]." *Wells*, 257 F.3d at 1141 (quoting *Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.*, 203 F.3d 1085, 1093–94 (8th Cir.), *cert. denied*, 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000)).

9. Turning to an analysis of the factors in this case, I find that the central purpose of the tile painting project, unlike the holiday display at issue in *Wells*, was to promote the views and private expression of the Plaintiffs and other members of the community that were invited to paint tiles as part of the healing process subsequent to the shootings. There is no evidence that the tiles they were invited to paint were to express the viewpoint of the School District or CHS. Second, the School District did exercise some editorial control over the content of the tile painting project, but the control was minimal, limited only to restrictions regarding names, initials, the date of the shooting, Columbine ribbons, religious symbols and the other prohibitions discussed herein. This is far different from the situation in *Wells* where the City and County exercised "complete control over the sign's construction, message, and placement". *Id.* at 1141. Moreover, unlike *Wells* where the City and County of Denver built and paid for the sign at issue, in this case the tiles were paid for by private donations. Third, the literal speakers in the tile project were Plaintiffs and other private members of the community, not the School District or its employees. Again, this is far different than *Wells* where the sign at issue was a "thank you" from the City to its sponsors. Only the fourth factor favors the Defendants, in that the ultimate responsibility for the contents of the tile project rested with the School District.

10. Nonetheless, I find that the majority of the factors support a finding that the tile painting project was private speech by the Plaintiffs and other members of the community who painted tiles. I thus reject the School District's argument that the tile painting project was government speech.

11. Defendants also rely for their argument that the tile painting project was government speech on *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011–12 (9th Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1653, 149 L.Ed.2d 636

(2001). I find that case distinguishable from the case at hand. In *Downs,* a public school teacher filed suit alleging that his employer, a public high school, violated his free speech rights when it removed, and asked him to remove, competing material that he had posted on a bulletin board in the school in response to materials posted by staff of the high school that recognized Gay and Lesbian Awareness Month. The Ninth Circuit found that the speech at issue on the bulletin boards was government speech. It based its finding on the fact that "[o]nly school faculty and staff [of the school] had access to post materials on these boards", materials posted on the bulletin boards were subject to the oversight of the school principals, who had "ultimate authority within the school over the content of the boards", and "any speech on the bulletin boards was directly traceable to [the school] and the school board through [the principals'] enforcement of [school] and school board policy." *Id.* at 1006–1012.

12. In this case, in contrast, the persons who painted the tiles were not school faculty or staff but private members of the community that were invited to the school to express their feelings. Although the tiles were subject to the oversight of school representatives, this oversight was limited only to ensuring that the tiles did not violate the very limited guidelines in place. Finally, the speech on the tiles was not "directly traceable" to CHS and/or the School Board through the enforcement of CHS and School Board policy. Instead, the tiles covered a broad array of topics and speech that was not governed by any policy of the School District, and only a narrow range of speech was prohibited by the School District's guidelines.

13. I now turn to Defendants' argument that the tile painting project constituted school-sponsored speech or speech that members of the public might reasonably perceive to bear the imprimatur of the school under *Hazelwood.* Again, if *Hazelwood* is found to be controlling, this will affect the forum analysis. Defendants argue that the tile painting project constituted school-sponsored speech because the project was organized by the school, participants were invited by school staff, they decorated tiles under staff supervision, used paints and tiles paid for with donation money controlled by school officials, and produced tiles to be permanently affixed in the hallways of the school. Defendants thus argue that the public would perceive the content of the tiles to represent the voice of the school and bear its imprimatur. Defendants further assert that their restrictions on the content of the tiles were reasonably related to legitimate pedagogical concerns because (1) the decision not to permit the tile painting project to become a memorial to and reminder of the shooting is related to the school's legitimate educational interest of ensuring the welfare of students and staff; and (2) schools have a legitimate interest, if not a constitutional obligation, to avoid religious divisiveness in the school setting.

14. I find that the tile painting project was not school-sponsored speech or speech that "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562. The Supreme Court in *Hazelwood* explained that its holding applies to activities conducted as part of the school curriculum. *Id.* at 271, 108 S.Ct. 562. Specifically, the Supreme Court held in that regard:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirma-

tively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and other members of the public might reasonably perceive to bear the imprimatur of the school. *These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.*

*Id.* at 270–71, 108 S.Ct. 562 (emphasis added) (citing *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).

15. In *Hazelwood,* the Supreme Court noted that "[s]chool officials did not deviate in practice from their policy that production [of the student newspaper at issue] was to be part of the educational curriculum and a 'regular classroom activit[y]'." *Id.* at 268, 108 S.Ct. 562. The newspaper was published as part of a journalism course and the teacher who supervised the newspaper "was the final authority with respect to almost every aspect of the production and publication of [the student newspaper], including its content." *Id.* In contrast, in this case there was no evidence presented at trial that the tile project was part of the school curriculum or that it was designed to impart particular knowledge or skills to student participants. Indeed, this argument would be illogical in light of the fact that a large number of tiles painted during the summer of 1999

were painted by members of the community at large. Moreover, the evidence at trial was that the school only had limited input into the tile project and the content of the tiles—limited to an attempt to ensure that tiles that violated the few restrictions stated in the guidelines did not get mounted on the walls.

16. Defendants also cite a number of other cases that found that speech was school-sponsored and subject to the *Hazelwood* analysis. However, I find that all of these cases are distinguishable. In *Ward v. Hickey,* 996 F.2d 448 (1st Cir.1993); *Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.,* 42 F.3d 719 (2nd Cir. 1994), *cert. denied,* 515 U.S. 1160, 115 S.Ct. 2612, 132 L.Ed.2d 856 (1995); *Webster v. New Lenox School Dist. No. 122,* 917 F.2d 1004 (7th Cir.1990); and *Miles v. Denver Public Schools,* 944 F.2d 773 (10th Cir. 1991), the speech at issue was that of a teacher/lecturer in a traditional classroom setting. Since such speech was clearly part of the school's curriculum, it was found to be school-sponsored and governed by *Hazelwood. See Ward,* 996 F.2d at 452–53 ("a teacher's statements in class . . . part of curriculum and a regular class activity" that is governed by *Hazelwood* ); *Silano,* 42 F.3d at 723 (the speech was school-sponsored because it was speech of a lecturer "in a traditional classroom setting"); *Webster,* 917 F.2d at 1008 ("[g]iven the school board's important pedagogical interest in establishing the curriculum and legitimate concern with possible establishment clause violations, the school board's prohibition . . . was appropriate"); *Miles,* 944 F.2d at 776 ("a teacher's expression in the 'traditional classroom setting'. . . bears the imprimatur of the school") (quoting *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562).[2] *DiLoreto,* although discussing and

---

2. *See also C.H. v. Oliva,* 990 F.Supp. 341, (D.N.J.1997) (speech at issue was that of a

applying certain aspects of *Hazelwood*, did not actually decide that the speech at issue was school-sponsored; instead, the analysis conducted by the Ninth Circuit was a forum analysis under *Cornelius*. *DiLoreto v. Downey Unified School Dist. Bd. of Education*, 196 F.3d 958 (9th Cir.1999), *cert. denied*, 529 U.S. 1067, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000) [3].

17. Defendants also asserted in their closing arguments that students or other persons coming into CHS five (5) years from now would not know the context of the tile project, and might believe that the tiles bear the imprimatur of the school. However, what a person believes five years from now is not the appropriate test in determining whether speech is school-sponsored or bears the imprimatur of the school. As the Tenth Circuit noted in *Wells* in connection with government speech, even assuming that "who the [observer] believes to be the speaker" is even relevant to the inquiry as to whose speech is at issue, the court's "consideration of that factor would be limited to the perception of an informed and objectively reasonable observer." *Id.*, 257 F.3d at 1142. That observer " 'must be deemed aware of the history and context of the community

in which the … display appears.… Nor can the knowledge attributed to the reasonable observer be limited to the information gleaned simply from viewing the challenged display.' " *Id.* (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995)).

18. Thus, even assuming that the observer's perception is a relevant factor in connection with determining whose speech is at issue, the inquiry is limited to the perception of a reasonable observer familiar with the history and context of the community and the forum in which the tile project appears. In this case, such an observer would be aware through the press releases and extensive media coverage of the events surrounding the shootings that CHS invited members of the Columbine community in to paint the tiles as part of the healing process, and that the tiles were not painted by or endorsed by CHS or the School District. Accordingly, I find that this factor, again, even if it is appropriate for consideration, does not support Defendants' argument that *Hazelwood* is applicable.[4]

---

student during classroom activities), *aff'd in part, vacated in part*, 226 F.3d 198 (3rd Cir. 2000), *cert. denied*, — U.S. —, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001); *Duran By and Through Duran v. Nitsche*, 780 F.Supp. 1048, 1054–55 (E.D.Pa.1991) (speech at issue was that of a student and the restrictions imposed were "rational regulations of activities that are school sponsored and/or curriculum related"), *order vacated, app. dismissed*, 972 F.2d 1331 (3rd Cir.1992).

3. Finally, to the extent that Defendant is relying on *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) in connection with its argument that *Hazelwood* is controlling, the Court notes that this is not a First Amendment case in which *Hazelwood* is even implicated, but is an Establishment Clause case.

4. Even if I did find that the speech was school-sponsored speech subject to the *Hazelwood* analysis, the Circuits are split as to whether *Hazelwood* allows a school to engage in viewpoint discrimination. *See Downs*, 228 F.3d at 1010–11 (9th Cir.2000) (noting "the absence of express 'viewpoint neutrality' discussion anywhere in *Hazelwood*" and discussing the split amongst the Circuits on this issue). It does not appear that the Tenth Circuit has decided this issue. It may well be that the Tenth Circuit would hold that viewpoint discrimination would not be warranted even if this speech were school-sponsored. However, since I found that the speech was not school-sponsored and that *Hazelwood* is inapplicable, I need not reach this issue.

19. The Court, having found that the speech is not government speech or school-sponsored speech, must next determine whether the Defendants opened a forum by inviting Plaintiffs and other members of the community to paint tiles. The Supreme Court has traditionally recognized three categories of fora in connection with government property for purposes of the First Amendment: (1) traditional public fora; (2) designated public fora; and (3) non-public fora. *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir.1997). The Plaintiffs do not contend that the tile display at CHS is a traditional public forum or even that the forum is a designated public forum. Thus, I need not address those issues. Instead, Plaintiffs contend that the forum was in fact a limited public forum, which in the more recent cases has been used to describe a type of non-public forum. *Summum*, 130 F.3d at 914–15 (citing *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439 and *Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510).

■ 20. The non-public forum consists of public property which is not by tradition or designation a forum for public communication. *Summum*, 130 F.3d at 916. When the government allows selected access to some speakers or some types of speech in a non-public forum, but does not open the property sufficiently to become a designated public forum, it creates a limited public forum. *Id.* When a limited public forum is created, the Supreme Court applies a reasonableness standard under which the state may restrict speech "so long as distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 914–15 (citing *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439). In other words, although the analysis in this type of forum is governed by

reasonableness, "[t]his does not mean the government has unbridled control over speech, . . . for it is axiomatic that 'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Summum*, 130 F.3d at 916 (quoting *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)).

■ 21. I find that the Defendants created a limited public forum in connection with the tile project when they opened the project up to those outside the school, *i.e.*, the families of the slain and injured victims and the other members of the public such as the rescue workers and care givers for wounded students. The purpose of the tile painting project as acknowledged by several witnesses, including Ms. Monseu, was to invite persons to express themselves as part of the healing process after the shootings at CHS. By inviting certain members of the general public to express themselves, Defendants opened the school beyond its official uses and created a limited public forum.

22. As the Tenth Circuit held in *Summum*, "while the government does have wide discretion to regulate a nonpublic forum consistent with the specific purpose for which it was intended—including banning *all* speech displays—problems arise when the government allows *some* speech on the property." *Id.*, 130 F.3d at 918. Thus, where the County allowed the erection of a stone monolith by a private fraternal order on the front lawn of a courthouse, *Summum* held that the County had created a limited public forum because "[b]y allowing access to the [fraternal order], the County has opened the forum to at least some private expression, clearly choosing not to restrict the forum to official government uses". *Id.* at 919.

23. Here, just like in *Summum*, the School District chose to open the school to at least some speech in the form of private expression by members of the Columbine community that were involved with the shootings or the rescue effort at CHS. By choosing to open the school to that expression, the School District created a limited public forum. *Id.; see also Rosenberger*, 515 U.S. at 824–830, 115 S.Ct. 2510 (university opened a limited public forum in connection with its Student Activities Fund which was designed "to support a broad range of extracurricular student activities" and which authorized payments to outside contractors to fund printing costs of publications issued by student groups); *DiLoreto*, 196 F.3d at 966–67 (where a high school baseball booster club raised funds by soliciting ads from local businesses, which ads were to be posted on the school's baseball field fence in exchange for a donation, the school district opened a limited public forum in connection with the solicitation of ads); *cf. Lamb's Chapel*, 508 U.S. at 391, 113 S.Ct. 2141 (where the Supreme Court assumed, without deciding, that the lower courts' decision that a school board had created a limited public forum by permitting the after-hours use of school property for certain specific social, civic and recreational uses was correct, but indicated in dicta that Lamb's Chapel's argument that the rules actually created a public forum had "considerable force").

24. I next must determine whether the restrictions on the tile project were reasonable in light of the purpose served by the forum and were viewpoint neutral. There were two distinct areas of speech that were prohibited: (1) tiles that contained names and initials of victims of the shooting or anyone involved in the shootings, the date of the shootings (April 20, 1999, "4/20/99" or "4/20"), the Columbine ribbon that symbolized a reminder of the shooting, as well as obscene or otherwise "inappropriate tiles"; and (2) tiles that contained religious symbols or religious speech of any kind.

25. As to the first area of speech, the Defendants' representatives at trial testified that this speech was prohibited because the School District did not want the tiles to become a memorial to the victims and did not want students to be traumatized by reminders of the shooting. However, the School District ultimately relaxed its restrictions in this area as to families of the victims. In that regard, Ms. Monseu told the families in September, 1999, that they could paint tiles with the names or initials of their children and that these tiles would be mounted on the walls of CHS. The only prohibition that continued to be enforced was that of the date of the shootings. Accordingly, as to this first area of prohibited speech, Plaintiffs contest only the continued restriction on tiles that reference the date of the shooting. Two of the Plaintiffs, Mr. and Mrs. Fleming, wished to paint this date on tiles. Plaintiffs assert that this restriction was not reasonable in light of the School District's purported purpose.

26. I find that Defendants' prohibition of the date of the shootings on the tile ("4/20/99" or "4/20") was not reasonable in light of its purported purpose. This is because Defendants applied inconsistent standards in connection with enforcing this alleged purpose. First, Defendants initially prohibited any reference to speech that might serve as a reminder of the shootings, including names of victims or those involved in the shooting, Columbine ribbons, and the date of the shootings. However, Ms. Monseu then informed the families that those standards were relaxed as to them and they could paint tiles that contained the names of their children and that those tiles would be mounted on walls

of CHS. The Court finds that allowing the name of a victim to be placed on a tile is no different than allowing the date of the shootings—both serve to act as reminders of the shootings. Further, as to the purpose of the restrictions being the prevention of a memorial, the School District's decision to allow the families to put the names of their slain children on the tiles certainly acts as at least as much of a memorial to the victims as the date of the shootings.

27. Second, if Defendants were sincere in their belief that allowing the date or other reminders of the shooting to be put on tiles would traumatize students, then one would expect the School District and CHS to be consistent in enforcing this prohibition throughout the school. However, the testimony showed that after the shootings, CHS received numerous plaques and memorials, some of which were placed in the administrative offices and/or other areas of CHS to which the students have access. One such memorial stated, "God Wept Over Columbine This Day, April 20, 1999", and another said, "IN HONOR OF THOSE THAT LOST THEIR LIVES OR THOSE THAT HAD THEIR LIVES CHANGED FOREVER ON APRIL 20, 1999." Numerous other memorials or reminders of the shooting were allowed by CHS, as detailed in Paragraphs 57 and 58 of the Findings of Fact. Given all of these reminders of the shooting and memorials that were allowed by the School District, including some that contained the date of the shootings, I find that it is unreasonable for the School District to disallow the date of the shootings on the tiles on the basis that it did not want reminders of the shootings in CHS.

In other words, the stated policy is unreasonable because it "is belied by 'objective indicia' of a contrary intent." *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir.2001), *cert. denied*, 70 U.S.L.W. 3091, —— U.S. ——, 122 S.Ct. 346, —— L.Ed.2d —— (October 9, 2001).

28. I turn now to the second prohibited area of speech, that of religious expression, and address whether this prohibition was reasonable and/or viewpoint neutral. Although Defendants argue that the prohibition on religious speech was also to ensure that the tiles would not serve as a memorial, Ms. Monseu testified that this prohibition was in place because the School District prohibited any religious speech throughout the District. Regardless of the Defendants' purpose in enacting this prohibition, I find that the prohibition on religious speech in connection with the tile project is viewpoint discrimination.[5]

29. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel*, 508 U.S. at 394, 113 S.Ct. 2141. In a limited public forum "when the government moves beyond restricting the subject matter of the speech and targets 'particular views taken by speakers on a subject,' such viewpoint discrimination is 'presumed impermissible.'" *Summum*, 130 F.3d at 917 (citing *Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510). The same reasoning applies to schools. As the Supreme Court in *Rosenberger* made clear, although a school may regulate the content of what is expressed when it is the speaker, "'[i]t does not follow ... that viewpoint-based restrictions are proper when the [school] does not itself speak or subsidize transmit-

---

5. Based on this finding, I need not address the issue of whether the prohibition on religious symbols was unreasonable in light of the purposes served by the forum. *See Good*

*News Club v. Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 2100, 150 L.Ed.2d 151 (2001).

tal of a message it favors but instead ... encourage[s] a diversity of views from speakers." " *Id.,* 515 U.S. at 833, 115 S.Ct. 2510.

■ 30. In this case, Defendants opened CHS up to certain members of the public for them to express their feelings about the shootings as part of a healing process. In connection with that accepted topic of expression, the Defendants allowed expressions of feelings on the tiles from a nonreligious viewpoint but not a religious viewpoint. I find that Defendants' actions constitute prohibited viewpoint discrimination. *See Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (school that opened a limited public forum to certain after school activities engaged in viewpoint discrimination when it permitted the teaching of morals and character development from a nonreligious perspective but not from a religious perspective); *Lamb's Chapel,* 508 U.S. at 393–94, 113 S.Ct. 2141 (a school district engaged in viewpoint discrimination when it excluded a private group from presenting films at the school discussing family values because the speech dealt with a subject that was otherwise permissible but was denied because the subject was dealt with from a religious perspective); *Rosenberger,* 515 U.S. at

830–32, 115 S.Ct. 2510 (a University engaged in viewpoint discrimination when it refused to fund a student publication because the publication addressed issues from a religious perspective); *Church on the Rock,* 84 F.3d at 1279 (City engaged in viewpoint discrimination in connection with policy at Senior Centers which prohibited use of the centers "for sectarian instruction or as a place for worship" because "[a]ny prohibition of sectarian instruction where other instruction is permitted is inherently non-neutral with respect to viewpoint...."); *see also Summum,* 130 F.3d at 918 ("[i]f ... the government permits secular displays on a nonpublic forum, it cannot ban displays discussing otherwise permissible topics from a religious perspective").[6]

31. The finding of viewpoint discrimination in this case is particularly justified since there were no real guidelines in place as to what constituted prohibited religious speech. Indeed, Plaintiffs testified that when they showed up for the tile painting sessions, they were given no specific guidelines as to what they could or could not paint. Ms. Monseu testified that it was up to CHS staff members to decide what was a religious symbol and no written guidelines were given to them. The staff members were required to use their own indi-

---

**6.** I note that the Ninth Circuit decided that viewpoint discrimination did not occur in a limited public forum in *DiLoreto.* I find that case is, however, instructive in the case at hand. In *DiLoreto,* a high school baseball booster club raised funds by soliciting ads from local businesses, which ads were to be posted on the school's baseball field fence in exchange for a donation. Mr. DiLoreto, a local businessman, purchased an ad that submitted a design containing the Ten Commandments. The school district declined to post the sign, and also excluded other "advertisements that involved subject matters deemed sensitive and inappropriate in the public secondary school context." *Id.,* 196 F.3d at 963. The Ninth Circuit recognized

that the school district had opened a limited public forum, and found that the exclusion of the Ten Commandments was both reasonable and viewpoint neutral. In holding that the school district's decision was viewpoint neutral, the Ninth Circuit based its finding on the fact that Mr. DiLoreto's ad "was not a statement addressing otherwise-permissible subjects [advertisement of a business] from a religious perspective"; instead, it was merely religious in nature, setting forth the Ten Commandments. *Id.* at 969. Here, in contrast, the tiles at issue did address otherwise permissible subjects, *i.e.,* the expression of feelings as part of the healing process, but were excluded solely because of their religious perspective.

vidual judgment in looking at each tile and decide on a tile by tile basis what was too religious to be placed on the walls at CHS. "Allowing government officials to make decisions as to who may speak ... without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another." *Summmum*, 130 F.3d at 920. An absence of express standards makes it far too easy for officials to use "post hoc rationalizations" and "shifting or illegitimate criteria" to justify their behavior. *Id.*

32. I next must consider whether Defendants can "overcome th[e] heavy presumption of impermissibility" regarding viewpoint discrimination. *Summmum*, 130 F.3d at 917. The Tenth Circuit on this issue, interpreting *Rosenberger*, held that the court "must examine viewpoint-based restrictions with an especially critical review of the government's asserted justifications for those restrictions." *Church on the Rock*, 84 F.3d at 1279–80. "At a minimum, to survive strict scrutiny the [state's] policy must be 'narrowly drawn to effectuate a compelling state interest.'" *Id.*

33. Defendants' primary argument as to why they have a compelling state interest in the prohibition against tiles containing religious speech is that they were seeking to avoid a violation of the Establishment Clause. Adherence to the Establishment Clause is a compelling government interest that may justify restrictions on speech. *Church on the Rock*, 84 F.3d at 1280. However, I first note that it is unclear whether the government's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination on speech. *Good News Club*, 533 U.S. at ——, 121 S.Ct. at 2103. The Supreme Court expressly decided in *Good News Club* not to decide the issue. *Id.*

34. Even assuming that the government's interest in avoiding an Establishment Clause violation justifies viewpoint discrimination, I find that Defendants are not justified in relying on the Establishment Clause to authorize the viewpoint discrimination that occurred in this case. As the Tenth Circuit noted in *Church on the Rock*, "[t]he Supreme Court has made it abundantly clear that providing equal access to a [limited public forum] for citizens engaging in religious expression and citizens engaging in secular expression does not violate the Establishment Clause." *Id.*, 84 F.3d at 1280. Defendants' policy in this case was neutral—they opened the tile project to members of the Columbine community as part of a healing process whereby people could come in and express their feelings about the shootings. Under such a neutral policy, the fact that religious speech was made along with nonreligious speech would not violate the Establishment Clause. As the Tenth Circuit noted in *Summmum*, "[e]ven if religion is benefitted incidentally, so long as the government treats religious and nonreligious speech evenhandedly and cannot be deemed to be sponsoring the religious activity, the government cannot plausibly argue that it is justified in denying private religious speech on public property because it fears the Establishment Clause will be offended." *Id.*, 130 F.3d at 921 (citing *Capitol Square*, 515 U.S. at 762–63, 115 S.Ct. 2440 and *Rosenberger*, 515 U.S. at 839–40, 115 S.Ct. 2510). In fact, "'the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.'" *Rosenberger*, 515 U.S. at 839, 115 S.Ct. 2510.

35. As to the argument that the students might perceive the school to be en-

dorsing religion, a factor established in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) that Defendants deem most applicable to their argument, the Supreme Court has indicated that endorsement will be found only where the speech at issue has "a *principal* or *primary* effect of advancing or endorsing religion." *Bauchman v. West High School,* 132 F.3d 542, 555 (10th Cir.1997), *cert. denied,* 524 U.S. 953, 118 S.Ct. 2370, 141 L.Ed.2d 738 (1998). "The Establishment Clause prohibits only those school activities which, in the eyes of a reasonable observer, advance or promote religion or a particular religious belief." *Id.* In this case, the tile project will be seen by the high school students that attend CHS as well as whatever other members of the public enter the school. The Supreme Court has indicated that "secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). "[T]here is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate." *Id.* at 251, 110 S.Ct. 2356. The Supreme Court in *Mergens* further noted that the school's "fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students." *Id.*

36. Based on the foregoing, I find that the students of CHS are mature enough to understand that the purposes of the tile project were to foster healing amongst the Columbine students, families of the victims and other members of the Columbine community, and not to endorse any views of the school. In other words, the students

can understand that the tiles that contained religious symbols were not school speech endorsing religion, but private speech "which the Free Speech and Free Exercise Clauses protect." *Mergens,* 496 U.S. at 250, 110 S.Ct. 2356. A reasonable observer or student would be aware of the "purpose, context and history" of education at CHS and would be aware of the purposes of the tile project, and that it did not have a principal or primary effect of endorsing religion. *Bauchman,* 132 F.3d at 555. In fact, the tiles containing religious expression were very limited in number compared to the total amount of tiles on the walls (only 80 to 90 tiles were removed from the walls whereas approximately 2100 tiles were painted). Further, the reasonable observer or student would be aware that school officials did not actively participate in the project, other than to ensure that the tiles did not exceed the guidelines discussed herein. Finally, CHS and the School District have the ability to control any impressions they give to the students concerning the project, and can make clear that the tiles do not contain an endorsement of the views of the schools.

37. Indeed, applying the Supreme Court's holding in *Good News Club,* I "cannot say the danger that [the students] would misperceive the endorsement of religion [by the tile project] is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the [religious tiles] were excluded." *Id.,* 533 U.S. at ——, 121 S.Ct. at 2106. Accordingly, I find that Defendants cannot rely on the Establishment Clause to justify a compelling state interest in connection with their viewpoint discrimination.

38. Defendants also asserted that they needed to prohibit religious symbols and the date of the shooting so that the tile project would not become a memorial to, and persistent reminder of, the tragedy.

In other words, Defendants asserted that these prohibitions were designed for the welfare of students and staff. However, I find that this is not a compelling state interest for the same reasons previously discussed in Paragraphs 26 and 27 of the Conclusions of Law; namely, the School District's inconsistency in enforcing its prohibitions. If the School District truly believed that the prohibition of memorials and/or reminders of the shootings was a compelling state interest, there is no logical reason why the School District would have changed its policy and allowed the families of victims to paint tiles containing the names of their slain children that would be mounted on the walls of CHS. Moreover, there is no logical reason why the School District would have allowed a poster saying "God Wept Over Columbine This Day April 20, 1999", a plaque stating "IN HONOR OF THOSE THAT LOST THEIR LIVES AND THOSE THAT HAD THEIR LIVES CHANGED FOREVER ON APRIL 20, 1999", or numerous other memorials that existed inside and outside CHS as detailed in Paragraphs 57 and 58 of the Findings of Fact, *supra*.[7] The same argument applies to Defendants' purported policy to exclude all religious speech from any of the schools in its District. Finally, if the School District truly intended to keep all religious symbols out of the schools, there is no logical reason why it would have allowed the religious symbols that existed at CHS, as detailed in Paragraphs 60 and 61 of the Findings of Fact, *supra*.

39. In conclusion, I find that Defendants engaged in viewpoint discrimination in connection with the prohibition of reli-

gious symbols from the tiles. Further, Defendants have not shown that their policy in this regard is narrowly drawn to effectuate a compelling state interest, or even that they have a compelling state interest in connection with their policy. Accordingly, I find that Defendants violated the Free Speech Clause of the First Amendment in connection with this prohibition. Moreover, I find that Defendants' prohibition of the date of the shootings, April 20, 1999, was not reasonable in light of its purported purpose, and that Defendants also violated the Free Speech Clause of the First Amendment in connection with this prohibition.

40. Accordingly, judgment shall be entered for Plaintiffs and against Defendants on Plaintiffs' first claim for relief for violation of the Free Speech Clause of the First Amendment. Plaintiffs' request therein for declaratory relief is GRANTED consistent with this Order, and I also GRANT Plaintiffs' request for injunctive relief. In accordance with that injunctive relief, Defendants were ordered within twenty (20) days of the Court's ruling issued on October 15, 2001, or by November 4, 2001, to provide an opportunity and place for Mr. and Mrs. Fleming to paint the tiles they wished to paint but were precluded from painting (as described in Paragraphs 38 and 40 of the Findings of Fact, *supra*.) Moreover, Defendants were ordered within twenty (20) days of the Court's ruling on October 15, 2001, or by November 4, 2001, to mount the tiles of the Petrones and Rohrboughs found at Plaintiffs' Exhibits 1 and 2.

7. I also reject any argument by Defendants that they had a compelling state interest in excluding religious symbols from the schools to ensure compliance with School District policy that religious symbols be excluded from schools in the District, since Defendants were not consistent in application of this policy either. *See* Paragraph 59 in the Findings of Fact, *supra*, which outlines various religious symbols in the school that were allowed by the School District.

B. *The Alleged Violation of the Article II, Section 10 of the Colorado Constitution (Second Claim for Relief)*

41. Plaintiffs' Second Claim is a pendant state claim which asserts that the tile painting is protected speech under Article II, Section 10 of the Colorado Constitution. Article II, Section 10 of the Colorado Constitution provides that, "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject." Plaintiffs argue that the Colorado Constitution provides greater protection for free speech than does the United States Constitution, citing *Bock v. Westminster Mall Company,* 819 P.2d 55, 58 (Colo.1991).

42. The Court need not address this claim because Plaintiffs conceded at trial that they did not seek to pursue this claim if they prevailed on their First Amendment claim under the United States Constitution. Indeed, Plaintiffs asserted in their proposed Findings of Fact and Conclusions of Law tendered to the Court that the Colorado Supreme Court has allowed a private lawsuit to enforce free speech rights only "[w]here there are no other mechanisms for protecting the rights of the citizen from being violated by government officials, such as no Free Speech claim under the First Amendment." *Proposed Findings of Fact, Conclusions of Law, and Order,* p. 19 (citing *Bock,* 819 P.2d at 58). Accordingly, judgment shall be entered for Defendants and against Plaintiffs on their second claim for relief for an alleged violation of Article II, Section 10 of the Colorado Constitution.

C. *The Alleged Violation of the Establishment Clause of the United States Constitution (Third Claim for Relief)*

43. Plaintiffs' Third Claim for Relief is for violation of the Establishment Clause of the First Amendment. The Establishment Clause dictates that "Congress shall make no law respecting an establishment of religion." *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 2540, 147 L.Ed.2d 660 (2000). The Establishment Clause is made binding on the States through the Fourteenth Amendment. *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 757, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated a three factor test in determining whether the Establishment Clause has been violated. Under that test, government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement between religion and the state. *Id.* at 612–13, 91 S.Ct. 2105. It is uncertain to what extent the *Lemon* factors are applicable today. As the Tenth Circuit has noted, "[b]eginning in the 1980s, ... the *Lemon* analysis came under vigorous attack by Justices and commentators alike." *Bauchman v. West High School,* 132 F.3d 542, 551 (10th Cir.1997), *cert. denied,* 524 U.S. 953, 118 S.Ct. 2370, 141 L.Ed.2d 738 (1998). However, in a very recent case by the Supreme Court, *Lemon* was applied by the majority as the applicable law. *Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Thus, I will address the Establishment Clause claim under the *Lemon* test.

44. However, I also note that *Bauchman* is the most recent Tenth Circuit pronouncement on the applicability of *Lemon.* *Bauchman* noted that, "[a]cknowledging *Lemon's* weaknesses, Justice O'Connor seized the opportunity in *Lynch v. Donnel-*

*ly* to draft a concurring opinion encouraging the Court to refine the *Lemon* analysis to focus more on whether the government is 'endorsing religion.'" *Id.* at 551 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 687–94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)). *Bauchman* noted that this "'endorsement test' is now widely accepted as the controlling analytical framework for evaluating Establishment Clause claims." *Id* at 552. "Applying Justice O'Connor's refined analysis, the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that 'religion or a particular religious belief is favored or preferred.'" *Id.* at 551 (quoting *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 592–93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). *Bauchman* further explained that "[r]ecent cases suggest the purpose component of the endorsement test should evaluate whether the government's 'actual' purpose is to endorse or disapprove of religion" (*i.e.,* did the government intend to endorse or disapprove of religion). *Id.* at 551. "The effect component, on the other hand, should evaluate whether a 'reasonable observer,' aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." *Id.* at 551–52.

45. The Tenth Circuit concluded in *Bauchman* that the purpose component of the endorsement test "is an unworkable standard that offers no useful guidance to courts...." *Id.* at 552. "Nevertheless, the uncertainty surrounding the present Court's position regarding the appropriate scope of the endorsement test and the appropriate Establishment Clause analysis, in general, cautions us to apply both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by

*Lemon,* when evaluating ... [an] Establishment Clause claim." *Id.* Because of the uncertainty surrounding the *Lemon* test, the Court will apply both *Lemon* and the test articulated in *Bauchman.*

46. Plaintiffs argue that the refusal of Defendants to allow the Plaintiffs to place tiles with religious symbols alongside other tiles in Columbine High School sends a message of exclusion and disfavor of religion. By excluding religion and religious expression from the forum opened by Defendants themselves, Plaintiffs argue that Defendants have exhibited the type of hostility toward religion that amounts to a violation of the Establishment Clause of the First Amendment. Further, Plaintiffs argue that Defendants have violated the Establishment Clause by excessively entangling government with religion.

47. I find that Plaintiffs have not proven a violation of the Establishment Clause by Defendants. First, I have not found, and Plaintiffs have been unable to provide, any Tenth Circuit case or any other case that has found a violation of the Establishment Clause under similar circumstances.

48. Second, as to first prong of *Lemon,* I find that Defendants have shown that their prohibition on religious symbols had a secular purpose. The Tenth Circuit has noted that to sustain an Establishment Clause claim in connection with this factor, the plaintiff must show the defendants had "no 'clearly secular purpose' for its policy." *Bauchman,* 132 F.3d at 554 (citations omitted). Plaintiffs have failed to present such evidence. To the contrary, witnesses for Defendants testified that they believed the prohibition on religious symbols, along with the prohibition on reminders of the shootings, was necessary to comply with the Establishment Clause and to prevent the tile project from becoming a memorial

to the victims of the shooting.[8] Further, Ms. Monseu testified that the reason religious symbols were not permitted was so that the School would not be seen as advocating for or against a particular religion. Also, I find no evidence that the School District's actual purpose in connection with their prohibition of religious symbols on tiles was to disapprove of religion.

49. Moreover, I find that the policy prohibiting religious symbols on the tiles did not have the principal or primary effect of inhibiting religion, which is the second factor articulated in *Lemon.* According to *Bauchman,* this is "an objective inquiry", focused on a "reasonable observer aware of the purpose, context and history" of the particular governmental action at issue. *Id.,* 132 F.3d at 555. Here, a reasonable observer familiar with the purpose, context and history of the tile project would be aware that the project was designed to allow members of the community affected by the shootings to paint tiles as part of the healing process. Further, they would be aware that the School District imposed certain prohibitions in connection with the tiles, including the prohibition on religious expression, so that the tiles would not become a memorial. The prohibitions were not designed in any way to inhibit religion.

50. Also, the Tenth Circuit has noted that "the mere fact that the [removal of certain Christian materials by a school] w[as] aimed exclusively at Christian religious materials does not automatically mean the actions' primary effect was to send a disapproving message regarding Christianity.... If we must draw any message from the actions, that message must be that the school district disapproves of the teaching of Christianity in the public schools." *Roberts v. Madigan,* 921 F.2d 1047, 1055 (10th Cir.1990), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). Similarly, in this case the mere fact that the School District removed certain Christian tiles from the walls and/or did not allow such tiles to be painted does not mean that the primary effect was to send a disapproving message regarding Christianity, particularly since the School District removed tiles that contained anything that might be deemed as a memorial to the shootings, such as tiles that contained names of the victims or other reminders of the shooting, and other tiles that they deemed to be offensive or inappropriate for the school.

51. Finally, there was not an excessive entanglement between religion and the School District in connection with the prohibition of religious symbols on the tiles. The Supreme Court in a recent case noted that excessive entanglement is essentially "an aspect of the inquiry into ... the effect [of the government action]." *Agostini v. Felton,* 521 U.S. 203, 231, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Id.* Here, the fact that the School District required that tiles be individually screened to ensure that tiles with religious symbols were removed from the walls simply does not amount to the level of excessive entanglement required for there to be an Establishment Clause violation. *See id.* at 233, 117 S.Ct. 1997 (rejecting argument of excessive entanglement where state program would require monitoring to ensure that Title I employees did not inculcate reli-

---

**8.** Although the Court previously found that the School District did not have an Establishment Clause defense to the First Amendment violation, this does not affect the conclusion that reliance on the Establishment Clause was a secular purpose of the School District for purposes of the Establishment Clause claim, even if such reliance was misguided in connection with the First Amendment.

gion); *Bowen v. Kendrick,* 487 U.S. 589, 615–17, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (no excessive entanglement where government reviews the adolescent counseling programs set up by the religious institutions that are grantees, reviews the materials used by such grantees, and monitors the program by periodic visits); *Roemer v. Board of Public Works of Md.,* 426 U.S. 736, 765–65, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (no excessive entanglement where state conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion).

52. In conclusion, I find that Plaintiffs have failed to show that the prohibition on religious symbols in connection with the tile project violated *Lemon* or *Bauchman.* Accordingly, judgment shall be entered for Defendants and against Plaintiffs on their third claim for relief for violation of the Establishment Clause of the First Amendment.

### D. *The Claims Against the Individual Defendants Under 42 U.S.C. § 1983*

■ 53. To the extent that Plaintiffs continue to assert official capacity claims against Defendants Tori Merritts, Debby Oberbeck and Jon DeStefano, these claims must be dismissed. Suits against public officials in their official capacity are in reality suits against the state and are barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

54. To the extent that Plaintiffs are suing Jon DeStefano in his individual capacity, the only actions of Mr. DeStefano that appear to be at issue are his statements that (1) it was the "strong consensus of the Board" that there be no religious symbols on the tiles displayed in the school; (2) that he "personally had a problem with religious symbols" on the tiles;

and (3) that it was Board policy to have no religious symbols of any kind in the school building. I find that the first and the third statements were made in Mr. DeStefano's official capacity as President of the School Board, since they state the Board's position on the issue of religious symbols. As such, a claim based on these statements would be barred under *Graham.*

55. The only statement that appears to be made in Mr. DeStefano's individual capacity is the statement that Mr. DeStefano personally had a problem with religious symbols on the tiles. Plaintiffs appear to recognize this in their Proposed Findings of Fact, Conclusions of Law and Order since that is the only statement that is referenced as to the individual capacity claim. Plaintiffs then argue that Mr. DeStefano was acting under color of state law, and that he violated the Establishment and Free Speech Clauses of the First Amendment by making this statement.

■ 56. Defendants argue that Mr. DeStefano is entitled to qualified immunity on this claim. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow* places a presumption in favor of immunity of public officials acting in their individual capacities. *Schalk v. Gallemore,* 906 F.2d 491 (10th Cir.1990). A plaintiff cannot defeat a defense of qualified immunity merely by alleging a violation of "extremely abstract rights." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized sense." *Id.* at 640,

107 S.Ct. 3034. Once the defense of qualified immunity is raised by a defendant, the plaintiff must come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred. *See Workman v. Jordan,* 32 F.3d 475, 479 (10th Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995).

57. I find that Mr. DeStefano is entitled to qualified immunity in connection with the alleged violation of the Establishment Clause. Plaintiffs only make a conclusory statement that Mr. DeStefano violated the Establishment Clause, citing no case authority for this proposition nor any explanation as to how the Establishment Clause was violated by Mr. DeStefano. Accordingly, Plaintiffs failed to meet their burden of showing either that Mr. DeStefano's conduct violated the law or that the law was clearly established that this conduct violated the Establishment Clause.

58. As to the argument that Mr. DeStefano violated the Free Speech Clause of the First Amendment, Plaintiffs asserted in their Proposed Findings of Fact, Conclusions of Law, and Order that the law was clearly established in the summer of 1999 that exclusion of speech from a religious viewpoint in any type of public forum is clearly prohibited, citing *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279 (10th Cir.1996). Even assuming that the law is as broad as Plaintiffs argue, Plaintiffs have failed to explain how a statement about Mr. DeStefano's personal feelings about religious symbols in schools bears on this issue. There was no evidence at trial that the decision to exclude tiles containing religious symbols was made by Mr. DeStefano personally. Instead, the decision was made by Ms. Monseu and the School Board generally. Accordingly, I find that Mr. DeStefano is also

entitled to qualified immunity in connection with this claim. Judgment shall thus be entered in favor of Defendant Jon DeStefano in his individual capacity and against Plaintiffs.

E. *Attorneys Fees Under 42 U.S.C. § 1988 (Fourth Claim for Relief)*

■ 59. 42 U.S.C. § 1988(b) provides, "[i]n any action or proceeding to enforce a provision of section[ ] 1981 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." Pursuant to this statute, I hereby allow Plaintiffs, as the prevailing party on their free speech claim under the First Amendment, to recover their reasonable attorneys' fees as part of the costs in this suit. Plaintiffs shall file a statement of fees that they seek to recover by Wednesday, November 14, 2001. Accordingly, judgment shall enter in favor of Plaintiffs and against Defendants on their fourth claim for attorneys' fees pursuant to 42 U.S.C. § 1988.

## IV. CONCLUSION

Based upon the foregoing, it is

ORDERED that the Clerk of Court shall enter judgment in favor of Plaintiffs and against Defendants on the first claim for relief based on a violation of the Free Speech Clause of the First Amendment. It is

FURTHER ORDERED that, consistent with the above, Plaintiffs' request in the first claim for declaratory and injunctive relief is GRANTED consistent with this Order. Specifically, as to the injunctive relief, Defendants are ordered by November 4, 2001, to: (1) provide an opportunity and place for Mr. and Mrs. Fleming to paint the tiles they wished to paint but were precluded from painting; and (2) mount the tiles painted by the Petrones

and Rohrboughs that are at issue in this case. It is

FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiffs on the second claim for relief for a violation of Article II, Section 10 of the Colorado Constitution. It is

FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiffs on the third claim for relief for a violation of the Establishment Clause of the First Amendment. It is

FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Defendants Tori Merritts and Debby Oberbeck, who are sued in their officials capacities, on all claims. It is

FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Defendant Jon DeStefano as to all claims asserted against him in both his official and individual capacities.

FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Plaintiffs and against Defendants on the fourth claim for relief since the Court has awarded Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. It is

FURTHER ORDERED that Plaintiffs shall file a statement of their attorneys' fees with thirty (30) days of October 15, 2001, or by November 14, 2001. Finally, it is

ORDERED that judgment shall be entered *nunc pro tunc* to October 15, 2001, the date this ruling was first announced by the Court.