Donald F. FLEMING; Deidra A. Fleming; Lisa M. Maurer; Brian E. Rohrbough; Susan A. Petrone; Richard P. Petrone, (individually), and Nicole M. Petrone, a minor child, by and through her father and next friend Richard P. Petrone, Plaintiffs-Appellees,

v.

JEFFERSON COUNTY SCHOOL DISTRICT R-1, a Colorado Quasi-Municipal corporation, Defendant-Appellant,

and

Jon DeStefano, Tori Merritts, David R. Digiacomo, Debby Oberbeck and Vince Chowdhury, individually and in their official capacities, Defendants,

American Center for Law and Justice, Christian Legal Society, Catholic League for Religious and Civil Rights, Ethics and Religious Liberty Commission, **Family Research Council, Focus on the Family, National Association of Evangelicals, and the Navigators, Amici curiae.**

No. 01–1512.

United States Court of Appeals, Tenth Circuit.

June 27, 2002.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Aug. 16, 2002.

W. Stuart Stuller (Alexander Halpern and Susan S. Schermerhorn of Caplan and Earnest LLC, Boulder, CO, with him on the briefs) for Defendant-Appellant.

James P. Rouse (Steven H. Aden of The Rutherford Institute, Charlottesville, VA, and William Scott Johns, Louisville, CO, with him on the brief) of Rouse & Associates, P.C., Greenwood Village, CO, for Plaintiffs-Appellees.

Stuart J. Lark and Gregory S. Baylor of Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, for Christian Legal Society, Catholic League for Religious and Civil Rights, Ethics and Religious Liberty Commission, Family Research Council, Focus on the Family, National Association of Evangeli-

cals, and The Navigators, amici curiae in support of Plaintiffs-Appellees.

Gregory N. Bryl, David A. Cortman, Stuart J. Roth, and Jay Alan Sekulow of American Center for Law and Justice, Alexandria, VA and Washington, DC, for The American Center for Law and Justice, amicus curiae in support of Plaintiffs-Appellees.

Before EBEL, HENRY and MURPHY, Circuit Judges.

EBEL, Circuit Judge.

Defendant-Appellant, Jefferson County School District ("the District"), appeals the district court's judgment granting declaratory and injunctive relief to Plaintiffs-Appellees, Donald Fleming et al. The district court entered judgment for the Plaintiffs, holding that the District's guidelines governing a tile painting project at Columbine High School ("CHS") violated the Plaintiffs' constitutional rights under the Free Speech Clause of the United States Constitution.[1] It issued an injunction ordering the District to (1) provide an opportunity for some of the Plaintiffs to paint the tiles they wished to paint but were precluded from doing so under the guidelines and (2) post Plaintiffs' tiles that were painted but not posted because they did not comply with the guidelines. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse and remand.

## I. Background

On April 20, 1999, two CHS students, Eric Harris and Dylan Klebold, entered the school and shot numerous students and teachers. They killed twelve students, including Daniel Rohrbough and Kelly Fleming, and one faculty member before taking their own lives. Upon deciding in the summer of 1999 to reopen the school, the District recognized that the "prospect of reintroducing students to the CHS building posed significant mental health challenges." "School officials made a concerted effort to change the appearance of the building to avoid incorporating sensory cues that could reactivate memories of the attack." School officials also sought ways to reacquaint students with the building. The CHS librarian, Elizabeth Keating, and art teacher, Barbara Hirokawa, proposed a project in which students would create "abstract artwork on 4-inch-by-4-inch tiles" that would be glazed, fired, and installed above the molding throughout the halls of the school.[2] The press release for the project stated that the project would serve "two purposes": "Students will have another opportunity to come into the school and become more comfortable with

1. The Plaintiffs brought the case against the District and members of the Jefferson County School Board in their official capacities and against the president of the School Board, Jon DeStefano, individually and in his official capacity under 42 U.S.C. §§ 1983 and 1988 seeking declaratory and injunctive relief and costs and attorneys fees. Plaintiffs alleged violations of (1) the Free Speech Clause of the First Amendment; (2) their free speech rights under both the Colorado Constitution; and (3) the Establishment Clause of the First Amendment. *Fleming v. Jefferson County Sch. Dist. No. R-1*, 170 F. Supp.2d 1094, 1096-97 (D.Colo.2001). The district court granted Plaintiffs judgment on their Free Speech Clause claim, but granted judgment to the District on the other two claims. The district court also granted judgment to members of the School Board and DeStefano. The Plaintiffs have not appealed any of the judgments against them, so only the Free Speech Clause issue is before us.

2. This abstract art tile project had been initiated two years prior to the summer of 1999, as part of an on going art project in the school's art classes. We refer to the tile painting project after the shooting, subject to the restrictions at issue, as the "tile project" throughout the opinion.

the surroundings. By participating in creating the tile art, they will also be a part of reconstruction of their school."

Ms. Keating and Ms. Hirokawa received approval for the expanded tile project from the area administrator, Barbara Monseu, who consulted with other administrators, including persons coordinating mental health efforts. "To assure that the interior of the building would remain a positive learning environment and not become a memorial to the tragedy, Ms. Monseu directed that there could be no references to the attack, to the date of the attack, April 20, 1999, or 4/20/93 [sic], no names or initials of students, no Columbine ribbons, no religious symbols, and nothing obscene or offensive." Tiles that did not conform to the guidelines were not to be hung. The tiles and supplies to be used in the tile project were paid for by private donations to the Jefferson Foundation and the Columbine Memorial Account. These donation monies were to be used at the discretion of CHS administrators.

During the summer of 1999, the District invited additional members of the affected community to participate in the tile project. In addition to current and incoming students, family members of the victims, rescue workers who responded to the shooting, and health care professionals who treated the injured were invited to paint tiles. The district court found that the purpose of the tile project was to "assist in community healing by allowing the community to 'retake' the school by participating in its restoration." Rescue workers and other community members who responded to the shooting painted tiles at a session in August, and the district court found that "hundreds" of people participated in this session. CHS graduates from 1998-1999, as well as people attending the CHS 1989 reunion, were also allowed to paint tiles. All of the invited participants had some relationship to the school or the shooting.

CHS teachers supervised the tile painting sessions and informed the participants of the guidelines, but did not give them written copies of these guidelines. School officials set up a table at the entrance of the painting area with examples and posters of acceptable tile designs, but did not identify specific symbols that would be prohibited as religious expression.

The Plaintiffs expressed dissatisfaction with the guidelines, and told the CHS instructors supervising the painting that they wished to paint the names of their children and religious symbols on their tiles. These tiles contained messages such as "Jesus Christ is Lord," "4/20/99 Jesus Wept," "There is no peace says the Lord for the wicked," names of victims killed in the shooting, and crosses. The teachers supervising the painting session told some of the Plaintiffs that they could paint the tiles as they wished, but "informed them that tiles that were inconsistent with the guidelines would be fired separately and would not be affixed to the walls, but would be given to them for their personal use."

The tiles were to be screened for compliance with the guidelines before they were sent to be fired and glazed, but due to the volume of tiles, some that were inconsistent with the guidelines escaped review. In addition to screening the tiles prior to firing them, CHS teachers instructed parent volunteers affixing the tiles to the walls not to post tiles that did not comport with the guidelines. If the volunteers had questions about whether a tile was appropriate, they were told to put it to the side. Ms. Monseu inspected the building after the tiles were affixed and noticed that some inappropriate tiles had been posted. The tiles were reviewed again, and approximately eighty to ninety tiles that were

inconsistent with the guidelines were removed, out of a total of 2,100 tiles that had been put on the walls. These tiles included ones with crosses, gang graffiti, an anarchy symbol, a "Jewish star," angels, the blue Columbine ribbon, a skull dripping with blood, the art teacher's name on the tile she painted, the date 4-20, and a mural containing red colors that were disturbing to some people.

A meeting was held in early September with the Plaintiffs and families of the victims, during which Ms. Monseu relaxed the restrictions that had previously been imposed, telling them that they could paint tiles with their children's names and initials, dates other than 4-20, and the Columbine ribbon, but that they could not paint religious symbols, the date of the shooting, or anything obscene or offensive. None of the Plaintiffs went to the school to repaint any tiles after this change of policy because "they had made their expressions previously or been denied the opportunity to paint the tiles they wanted to paint." Plaintiffs then brought this suit under 42 U.S.C. §§ 1983 and 1988 for an alleged violation of their free speech rights and the Establishment Clause.[3] The district court granted judgment for the Plaintiffs on their free speech claim under the United States Constitution, and the District brought this appeal.

## II. Discussion

### A. Standard of Review

■■■ In cases involving activity that may be protected under the Free Speech Clause, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Lytle v. City of Haysville*, 138 F.3d 857, 862 (10th Cir.1998) (internal quotation marks omitted). The district court's findings of constitutional fact are reviewed de novo, as are its ultimate conclusions of constitutional law. *Revo v. Disciplinary Bd. of the Sup. Ct. for the State of N.M.*, 106 F.3d 929, 932 (10th Cir.1997). Other factual findings, however, are reviewed for clear error. *Brown v. Palmer*, 915 F.2d 1435, 1441 (10th Cir.1990), *aff'd on reh'g*, 944 F.2d 732 (10th Cir.1991) (en banc).

We reject Appellees' assertion that our standard of review on issues of First Amendment protected speech depends on which party prevailed below. They assert that because the purpose of an independent examination "is to restrain government power from unlawful restrictions on free speech," such an independent review is not necessary in this case because "[t]he trial judge protected the free speech rights of the [Plaintiffs]." This argument misunderstands the reasoning of an independent review. It is the issue, the constitutional freedom of speech, that triggers an independent examination of the record, not the outcome below. "[A]s with other fact-intensive, mixed questions of constitutional law, ... '[i]ndependent review is ... necessary ... to maintain control of, and to clarify, the legal principles' governing the factual circumstances necessary to satisfy the protections of the Bill of Rights." *Lilly v. Virginia*, 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (quoting *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Further, this court previously has conducted an independent review of the record in First Amendment cases where the government appeals the district court decision below.

---

**3.** With the initiation of this suit, District officials "froze" the tile project. There are approximately a thousand tiles that have been painted, but have not been evaluated by the District for compliance with the guidelines or posted on the walls.

*See Revo,* 106 F.3d at 932; *Melton v. City of Okla. City,* 928 F.2d 920, 927 (10th Cir.1991) (en banc); *Brown,* 915 F.2d at 1441.

## B.  Analysis

The district court held that the tiles at issue constituted neither government speech, nor "school-sponsored" speech, but were private speech in a limited public forum. It found that the District's guidelines prohibiting the date of the shooting was not reasonable in light of the tile project's purpose, and that the prohibition on religious symbols was not viewpoint neutral. We disagree with the district court that the tile project is not "school-sponsored" speech as defined by *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

### 1.  Speech in School Setting

We begin by recognizing that there are three main categories of speech that occur within the school setting. Student speech that "happens to occur on the school premises" is governed by *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).[4] *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562. The black armbands worn by the students in *Tinker* are representative of the pure student expression that a school must tolerate unless it can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities." *Tinker,* 393 U.S. at 514, 89 S.Ct. 733.

■ At the opposite end of the spectrum is government speech, such as the principal speaking at a school assembly. When the government speaks, it may choose what to say and what not to say. *Wells v. City & County of Denver,* 257 F.3d 1132, 1144 (10th Cir.2001) (" '[T]he First Amendment does not preclude the government from exercising editorial control over its own medium of expression.' ") (quoting *Muir v. Ala. Educ. Television Comm'n,* 688 F.2d 1033, 1044 (5th Cir. 1982) (en banc)), *cert. denied, Wells v. City & County of Denver,* — U.S. —, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001). To discern whether expression is government speech, we apply the four factor analysis articulated in *Wells:* (1) whether the "central purpose" of the project is to promote the views of the government or of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4) whether "ultimate responsibility" for the project rested with the government. *Id.* at 1141.

■ Between pure student speech and government speech is "school-sponsored" speech, which is governed by *Hazelwood.* School-sponsored speech is student speech that a school "affirmatively . . . promote[s]," as opposed to speech that it "tolerate[s]." *Hazelwood,* 484 U.S. at 270-71, 108 S.Ct. 562. "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" constitute school-sponsored speech, over which the school may exercise editorial control, "so long as [its] actions are reasonably related

---

4.  "Vulgar," "lewd," and "plainly offensive" student speech is governed by *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), as opposed to *Tinker. Hazelwood,* 484 U.S. at 271 n. 4, 108 S.Ct. 562. The tiles in this case do not fall into this category. Because the critical issue in this case is whether the speech is student speech, school-sponsored speech, or government speech, we have focused our analysis on these three categories of speech in the school setting.

to legitimate pedagogical concerns." *Id.* at 271, 273, 108 S.Ct. 562. We believe that the tile project at CHS constitutes school-sponsored speech and is therefore governed by *Hazelwood.*

### 2. *Hazelwood*

At issue in *Hazelwood* was a high school principal's excision of two pages of a student newspaper containing articles on teen pregnancy and the impact of divorce on students at the school. The newspaper, *Spectrum,* was produced by the school's journalism class, funded with Board of Education funds, and supervised by a faculty sponsor. The faculty advisor "was the final authority with respect to almost every aspect of the production and publication" of *Spectrum,* including its content, and every issue was reviewed by the principal prior to publication. *Id.* at 268-69, 108 S.Ct. 562 (internal quotation marks omitted).

In *Hazelwood,* the Court began by determining whether the newspaper could be characterized as a public forum. Because public schools do not possess the attributes of traditional public forums, the Court found that "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." *Id.* at 267, 108 S.Ct. 562 (internal citations omitted) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). If, instead, the facilities have "been reserved for some other intended purpose, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id.* (quoting *Perry Educ. Ass'n,* 460 U.S. at 46 n. 7, 103 S.Ct.

948). The Court found that the school had not opened up *Spectrum* for "'indiscriminate use'" by student reporters or the student body generally, and instead, that it had "'reserve[d] the forum for its intended purpos[e],'" a supervised learning experience for journalism students. *Id.* at 270, 108 S.Ct. 562 (quoting *Perry Educ. Ass'n,* 460 U.S. at 47, 46, 103 S.Ct. 948). Accordingly, school officials could regulate the contents of *Spectrum* in "any reasonable manner." *Id.*

The district court read *Hazelwood* as only applying "to activities conducted as part of the school curriculum." *Fleming,* 170 F. Supp.2d at 1108. We believe this reading of *Hazelwood* is too narrow. We read the Court's definition of "school-sponsored" speech to mean activities that might reasonably be perceived to bear the imprimatur of the school and that involve pedagogical concerns.

In *Hazelwood,* the Court drew a crucial distinction between a school's toleration of student speech that "happens to occur on the school premises," and student speech that a school "affirmatively ... promote[s]." *Id.* at 270-71, 108 S.Ct. 562. As opposed to the pure student speech in *Tinker,* the Court held that a different standard applied for determining "when a school may refuse to lend its name and resources to the dissemination of student expression." *Id.* at 272-73, 108 S.Ct. 562. Two critical concerns drove the Court in articulating the standard for school-sponsored speech: the imprimatur and pedagogical interests of the school. If the speech at issue bears the imprimatur of the school and involves pedagogical interests, then it is school-sponsored speech, and the school may impose restrictions on it so long as those restrictions are reasonably related to legitimate pedagogical concerns.

The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech. Expressive activities that do not bear the imprimatur of the school could include a variety of activities conducted by outside groups that take place on school facilities after-school, such as club meetings. *See generally, Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 2098, 150 L.Ed.2d 151 (2001) (involving a Christian children's club after-school meetings). In contrast, expressive activities that the school allows to be integrated permanently into the school environment and that students pass by during the school day come much closer to reasonably bearing the imprimatur of the school. *Cf. DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 968 (9th Cir.1999) (validating the concern that students would be a "captive audience" to speech posted on the fence of a school's baseball field).

Further, the level of involvement of school officials in organizing and supervising an event affects whether that activity bears the school's imprimatur. *See Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 828-29 (9th Cir.1991) (en banc) (finding that because school officials exercised "editorial control" over and had to "specifically approve" the speech at issue, that members of the public would likely perceive the speech " 'to bear the imprimatur of the school' "); *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.1989) (finding there was "no doubt" that a student election and election

assembly were " 'school-sponsored' " where the school scheduled the assembly during school-hours on school property, "made attendance compulsory," "determined the eligibility of prospective speakers," provided the voting machines, and "vetted [the candidates'] speeches in advance").

The Court in *Hazelwood* also recognized the school's pedagogical interests. Pedagogical means related to learning, and, like the *Hazelwood* Court, we give substantial deference to educators' stated pedagogical concerns. The Court recognized that its articulated standard for school-sponsored expression was "consistent with [its] oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562.[5]

We think that the Court's language that activities are "school-sponsored" speech if they are "designed to impart particular knowledge or skills to student participants and audiences," *id.* at 271, 108 S.Ct. 562, means activities that affect learning, or in other words, affect pedagogical concerns. "The universe of legitimate pedagogical concerns is by no means confined to the academic .... [for it includes] discipline, courtesy, and respect for authority." *Poling*, 872 F.2d at 762. Many cases have applied a *Hazelwood* analysis to activities outside the traditional classroom where, so long as the imprimatur test is satisfied, the pedagogical test is satisfied simply by

---

5.  This court has also recognized our limited role as federal judges in reviewing school decisions. *See West v. Derby Unified Sch. Dist.*, 206 F.3d 1358, 1363 (10th Cir.2000) ("[W]e reaffirm the principle that '[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint .... By and large, public education in our Nation is committed to the control of state and local authorities.' ") (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)), *cert. denied, West v. Derby Unified Sch. Dist.*, 531 U.S. 825, 121 S.Ct. 71, 148 L.Ed.2d 35 (2000); *Miles v. Denver Pub. Schs.*, 944 F.2d 773, 779 (10th Cir.1991) ("We will protect appropriate constitutional interests. We should not and will not run the schools.").

the school district's desire to avoid controversy within a school environment. *See Brody v. Spang,* 957 F.2d 1108, 1122 (3d Cir.1992) (commencement exercises and stating that avoidance of controversy is a valid pedagogical purpose); *Planned Parenthood,* 941 F.2d at 828 (upholding the school's purpose in avoiding controversial topics in advertisements contained in programs distributed at athletic events); *Crosby v. Holsinger,* 852 F.2d 801, 802 (4th Cir.1988) (finding school had a valid pedagogical concern in avoiding a school mascot that was controversial to a segment of the school population); *Lundberg v. West Monona Cmty. Sch. Dist.,* 731 F.Supp. 331, 338-39 (N.D.Iowa 1989) (concluding school had valid educational purpose in avoiding religious controversy by banning prayer at commencement exercises); David L. Dagley, *Trends in Judicial Analysis Since Hazelwood: Expressive Rights in the Public Schools,* 123 Ed. Law Rep. 1, 9 (1998) ("In *Hazelwood,* curriculum became anything that might be perceived as bearing the sponsorship of the school."); Bruce C. Hafen, Comment, *Hazelwood School District and the Role of First Amendment Institutions,* 1988 Duke L.J. 685, 693-94 (1988) (stating that an education-related activity is one supervised by a faculty member and designed to impart knowledge and skills to students "*or* an activity that 'students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.'" (emphasis added) (quoting *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562)). Indeed, the pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students.

Under *Hazelwood,* educators may exercise control over school-sponsored speech so long as their actions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. 562. The Court recognized educators' need to consider "the emotional maturity of the intended audience" when disseminating student speech on "potentially sensitive topics," as well as the school's prerogative to not "associate [itself] with any position other than neutrality on matters of political controversy." *Id.* at 272, 108 S.Ct. 562.

■ Finally, we conclude that *Hazelwood* allows educators to make viewpoint-based decisions about school-sponsored speech. If *Hazelwood* required viewpoint neutrality, then it would essentially provide the same analysis as under a traditional nonpublic forum case: the restriction must be reasonable in light of its purpose (a legitimate pedagogical concern) and must be viewpoint neutral. *See Hawkins v. City & County of Denver,* 170 F.3d 1281, 1287 (10th Cir.1999). In light of the Court's emphasis on the "special characteristics of the school environment," *Hazelwood,* 484 U.S. at 266, 108 S.Ct. 562 (internal quotation marks omitted), and the deference to be accorded to school administrators about pedagogical interests, it would make no sense to assume that *Hazelwood* did nothing more than simply repeat the traditional nonpublic forum analysis in school cases.

Our sister circuits have split over whether *Hazelwood* requires that schools' restrictions on school-sponsored speech be viewpoint neutral. Most recently, a panel of the Third Circuit expressed its view that *Hazelwood* does not require viewpoint neutrality of school districts. "*Hazelwood* clearly stands for the proposition that educators may impose non-viewpoint neutral restrictions on the content of student speech in school-sponsored activities so long as those restrictions are reasonably related to legitimate pedagogical concerns." *C.H. ex rel. Z.H. v. Oliva,* 195 F.3d 167, 172-73 (3d Cir.1999), *vacated for en*

banc review, *C.H. ex rel. Z.H. v. Oliva,* 197 F.3d 63 (3d Cir.1999) (en banc).[6] The *C.H.* panel reasoned that

> the requirement of viewpoint neutrality, while essential to the analysis of a school's restrictions on extracurricular speech, such as that at issue in *Rosenberger [v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)]* and *Lamb's Chapel [v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)],* is simply not applicable to restrictions on the State's own speech. Under *Hazelwood,* "educators are entitled to exercise greater control over student expression when it is elicited as part of a teacher-supervised, school-sponsored activity. In that specific environment, viewpoint neutrality is neither necessary nor appropriate, as the school is there responsible for determining the content of the education it provides.

195 F.3d at 173 (internal citations, quotation marks, ellipses, and alterations omitted). The First Circuit reached a similar conclusion in *Ward v. Hickey.* 996 F.2d 448, 454 (1st Cir.1993) ("[T]he Court in *[Hazelwood]* did not require that school regulation of school-sponsored speech be viewpoint neutral.").

On the other side of the debate, the Ninth Circuit in *Planned Parenthood* held that *Hazelwood* required viewpoint neu-

trality. *Planned Parenthood,* 941 F.2d at 829 (requiring viewpoint neutrality but holding that the school district was viewpoint neutral in prohibiting all advertisements in school sponsored publications addressing the subject of birth control). A subsequent panel of that Circuit, however, recently has criticized that holding. *Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003 (9th Cir.2000), *cert. denied, Downs v. Los Angeles Unified Sch. Dist.,* 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001). "Despite the absence of express 'viewpoint neutrality' discussion anywhere in *Hazelwood,* the *Planned Parenthood* court incorporated 'viewpoint neutrality' analysis into nonpublic forum, school-sponsored speech cases in our Circuit." *Id.* at 1010. The *Downs* court found itself "compelled by *Planned Parenthood*" to view the school's restrictions on speech "through a viewpoint neutrality microscope" if it found that the speech at issue was school-sponsored.[7] *Id.* at 1011.

A divided panel of the Sixth Circuit in *Kincaid v. Gibson,* 191 F.3d 719 (6th Cir. 1999), stated, without discussion, that the *Hazelwood* Court "noted" that non-viewpoint-based restrictions were part of its analysis. *Id.* at 727, *rev'd and remanded on other grounds,* 236 F.3d 342 (6th Cir. 2001) (en banc). Upon rehearing en banc, the Sixth Circuit held that the previous panel had erred in applying *Hazelwood* to

---

**6.** Upon rehearing en banc, an equally divided Third Circuit affirmed the district court's ruling on procedural grounds, dismissing some claims for want of jurisdiction, and remanding to give plaintiff an opportunity to cure the deficiencies in her complaint. *C.H. ex rel. Z.H. v. Oliva,* 226 F.3d at 200-01, (3d Cir.2000) (en banc), *cert. denied, Hood v. Medford Township Bd. of Education,* 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001). The en banc panel "decline[d] to address the tendered constitutional issue under these circumstances." *Id.* at 203.

**7.** In *Downs,* a teacher wanted to post messages contrary to the school's message of tolerance on a bulletin board that the school had designated for Gay and Lesbian Awareness Month. 228 F.3d at 1005-07. The teacher contended that the school impinged upon his free speech rights when it refused to allow him to post the messages. *See id.* at 1005. The *Downs* court upheld the school's restrictions, finding that the speech posted on the bulletin board was government speech, and therefore not governed by *Hazelwood. Id.* at 1011.

the case of a university newspaper, and found that the newspaper was not a non-public forum, but instead was subject to the stricter standards of a designated public forum. *Kincaid*, 236 F.3d at 346 & n. 5. Because the *Kincaid* panel opinion was reversed, it does not offer us much persuasive value.

Finally, the Eleventh Circuit has expressed doubts that the *Hazelwood* Court intended to "drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views," *Searcey v. Harris*, 888 F.2d 1314, 1319 n. 7 (11th Cir.1989), and stated it would "continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Id.* at 1325. Such a conclusion seems contrary to the emphasis that the *Hazelwood* Court placed on the uniqueness of the public school setting and the deference with which it viewed decisions made by educators.

We find the reasoning in *C.H.* to be persuasive and hold that *Hazelwood* does not require educators' restrictions on school-sponsored speech to be viewpoint neutral. Starting with *Hazelwood* itself, the case makes no mention that the school's restriction must be neutral with respect to viewpoint, although the Court had already decided *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), which stated that government restrictions in a nonpublic forum must not discriminate based on viewpoint. *Id.* at 806, 105 S.Ct. 3439. Second, the Court's specific reasons supporting greater control over school-sponsored speech, such as determining the appropriateness of the message, the sensitivity of the issue, and with which messages a school chooses to associate itself, often will turn on viewpoint-based judgments. "A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,' or to associate the school with any position other than neutrality on matters of political controversy." [8] *Hazelwood*, 484 U.S. at 272, 108 S.Ct. 562 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)) (internal citations omitted). No doubt the school could *promote* student speech advocating against drug use, without being obligated to sponsor speech with the opposing viewpoint. *Hazelwood* entrusts to educators these decisions that require judgments based on viewpoint.[9]

Given the types of decisions that the *Hazelwood* Court recognized face educators in " 'awakening the child to cultural values' " and promoting conduct consistent with " 'the shared values of a civilized social order,' " we conclude that *Hazelwood*

---

**8.** Whether one reads this sentence as granting a school "the authority ... to associate itself with any position other than neutrality," or "the authority to refuse ... to associate itself with any position other than neutrality" on controversial subjects, the import remains the same--a school must "retain the authority" to decide with which positions it will associate itself.

**9.** Although we have never addressed this issue directly, our previous opinion in *Miles* suggests *Hazelwood* does not require viewpoint neutrality. *Miles v. Denver Pub. Sch.*, 944 F.2d 773 (10th Cir.1991). After classifying the speech at issue as "school-sponsored" and finding that the school had asserted legitimate pedagogical interests supporting its restriction of the speech, the *Miles* court stated that *"the only remaining question* under *Hazelwood* is whether the actions taken by the school are reasonably related to legitimate pedagogical interests." *Id.* at 778 (emphasis added). We never suggested that viewpoint neutrality enters into the analysis.

does not require viewpoint neutrality. *Hazelwood*, 484 U.S. at 272, 108 S.Ct. 562 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and *Fraser*, 478 U.S. at 683, 106 S.Ct. 3159).

### 3. Application of *Hazelwood*

■■ We now turn to applying *Hazelwood* to the facts of this case. We begin by asking whether the tile project constituted a public forum. *See Miles*, 944 F.2d at 776. The Supreme Court has recognized three distinct categories of government property: "(1) traditional public fora; (2) designated public fora; and (3) nonpublic fora." *Hawkins*, 170 F.3d at 1286. The parties concede that the tile project does not constitute a traditional public forum or a designated public forum, and our review of the record comports with this analysis.[10] As recognized by the Court in *Hazelwood*, "public schools do not possess all of the attributes of streets, parks, and other traditional public forum that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " 484 U.S. at 267, 108 S.Ct. 562 (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Nor do we believe that the tile project constitutes a designated public forum, as the District has not " 'by policy or practice' " opened the tile project " 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." *Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562 (internal citations omitted) (quoting *Perry Educ. Ass'n*, 460 U.S. at 47, 103 S.Ct. 948). From the tile project's inception after the shooting, the District created and enforced restrictions on what participants were allowed to paint, supervised the painting sessions, and screened out inappropriate tiles. By showing this "affirmative intent to retain editorial control and responsibility over" the tile project, the District demonstrated that it had not opened the tile project to indiscriminate use by the participants. *Planned Parenthood*, 941 F.2d at 824. *See, e.g., Hawkins*, 170 F.3d at 1288 (finding nonpublic forum where city allowed limited speech on property but consistently enforced restrictions on leafletting and picketing). Instead, the District reserved the tile project "for its intended purpose," *Hazelwood*, 484 U.S. at 270, 108 S.Ct. 562 (alteration and internal quotation marks omitted), which was allowing participants to take part in a reconstruction of the school. The level of control that the District retained over the tile project fails to reveal the "clear intent to create a public forum" that *Hazelwood* requires. *Id.* at 270, 108 S.Ct. 562. We therefore conclude that the tile project was a nonpublic

10. Appellees contend that the tile project is a "limited public forum," which they acknowledge has recently been analyzed under a nonpublic forum rubric. *See Summum v. Callaghan*, 130 F.3d 906, 914-15 (10th Cir.1997) ("In more recent cases, however, the Court has used the term 'limited public forum' to describe a type of nonpublic forum and has applied a reasonableness standard," wherein the government may restrict speech "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.") (internal citations and internal quotation marks omitted). They argue that the District's restrictions were un- reasonable and impermissibly discriminatory based on viewpoint, which is generally prohibited even in a nonpublic forum. *See Ark. Educ. Television Comm'n. v. Forbes*, 523 U.S. 666, 677-78, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Thus, their central point on appeal is that the tile project should be analyzed under the traditional nonpublic forum analysis, because they believe it does not constitute school-sponsored speech under *Hazelwood*, or in the alternative, that even under a *Hazelwood* analysis, the District's restrictions were not reasonably related to legitimate pedagogical concerns.

forum and turn to whether the tile project constitutes school-sponsored speech.

### a. Imprimatur

The tiles at issue in this case will become a lasting part of the school. The presence of permanently affixed tiles on the walls implicates the school's approval of those tiles. When coupled with organizing, supervising, approving the funding, and screening the tiles, the school's decision permanently to mount them on the walls conveys a level of approval of the message. If a tile advocating racial hatred or sexual bigotry or encouraging the use of illicit drugs were affixed to the walls, community members rightly might protest that the school implicitly, if not explicitly, promoted such values and conduct. When a tile, created pursuant to a project that the school supervised, and for which it approved funding, is displayed permanently on school grounds, and when that project aims to advance pedagogical concerns, the tile will normally be considered school-sponsored speech.

In concluding that the tiles do not bear the imprimatur of the school, the district court noted that a reasonable observer, charged with the history and context in which the display appears, *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 779-81, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring), "would be aware through the press releases and extensive media coverage of the events surrounding the shootings that CHS invited members of the Columbine community in to paint the tiles as part of the healing process, and that the tiles were not painted by or endorsed by CHS or the School District." *Fleming,* 170 F. Supp.2d at 1110. No doubt the variety and number of tiles would lead an observer to understand that the school itself did not paint the tiles. However, the observer would

likely perceive that the school had a role in setting guidelines for, and ultimately approving, the tiles it allowed to become a part of the school itself, which in this case, it did.

The level of school involvement over the tile project also belies a conclusion that the tiles did not bear the imprimatur of the school. Although the district court characterized the school's input as "limited," it made factual findings that the District invited participants to take part in the painting sessions, held the tile painting sessions at CHS, had faculty members supervise the sessions, informed the participants "generally of the guidelines for tile content," set up a table at the entrance with "examples and posters of acceptable tile designs," allocated the funds for the tile project out of the private fund which was "to be used at the discretion of the principal," tried to screen and pull tiles inconsistent with the guidelines before they were sent to be fired, organized parent volunteers to affix the tiles and gave them instructions regarding inappropriate subject matter, and evaluated and removed inappropriate tiles that had fallen through the screening process. This level of involvement varies greatly from the school cases involving extracurricular activities, such as *Good News Club,* where the school did not call the meetings, invite participants, set the agenda, approve funding, or supervise the meetings. Although the painting activity took place outside of school hours and was not mandatory, the *effects* of the painting are visible on the school walls throughout the building, during the school day when children are compelled to attend.

Finally, in arguing that the tile project was not school-sponsored, the Plaintiffs rely heavily on Ms. Monseu's statement in her deposition saying that "this is a project outside of the school, this is a separate project, but we're trying to keep track of

what's going on, not necessarily control everything, but keep track of what's going on." [11] We are obligated to examine the record as a whole, however, and evaluate what the school actually did, as opposed to carving out an isolated statement from the record. Because the school permanently integrated the tiles into the school environment, and was significantly involved in the creation, funding, supervision, and screening process of the tile project, we conclude that the tiles bear the imprimatur of the school.

### b. Pedagogical Concerns

We also find that the goal of the tile project, allowing participants to take part in the reconstruction of the school, involves the type of pedagogical interests with which *Hazelwood* was concerned. The purpose of reacquainting the students with the school and participating in community healing falls under the broad umbrella that courts have given to pedagogical purposes. For instance, one court has instructed that school-sponsored activities under *Hazelwood* "need not occur in a traditional classroom setting," *Henerey v. City of St. Charles,* 200 F.3d 1128, 1133 (8th Cir.1999) (internal quotation marks omitted), and pedagogical purposes such as teaching civility, learning leadership skills, and exposing students to the democratic process have been found to satisfy this component of

*Hazelwood. See id.* (finding school elections are pedagogical); *Poling,* 872 F.2d at 762 (6th Cir.1988) (same). Further, the environment in which learning takes place, such as the school's hallways, can be a pedagogical concern, as it affects the learning process.[12]

We do not think that the involvement of community members in the tile project makes it any less of a school-sponsored event. The pedagogical concerns recognized in *Hazelwood,* such as the emotional maturity of the audience and the sensitivity of the topic, focus on who is listening, rather than who is speaking. *Hazelwood,* 484 U.S. at 271-72, 108 S.Ct. 562. The Ninth Circuit also recognized in *Planned Parenthood* that even though the speech at issue was from an outside entity, rather than a student, the *Hazelwood* analysis did not change. 941 F.2d at 827.

> The publication is the same and the audience is the same, whether the source for the speech is from inside the school or outside, is paid or free. The school has the same pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, *no matter who the speaker is.*

*Id.* (emphasis added).

The District's recognition that the school is part of a larger community, here includ-

---

11. In any event, this is a fairly ambiguous statement. This statement may convey nothing more than the obvious—that the project involved painting sessions outside of school hours, in which selected non-students (but nevertheless individuals with a connection to the tragedy of the shootings) could participate, and the school did not mandate what must be painted (as opposed to controlling those things that could not be painted). That statement does not sufficiently disengage the school so as to avoid the school's imprimatur on the project.

12. At oral argument, counsel for the Appellees agreed that pervasive tiles throughout the school hallways touched upon a pedagogical concern. Judge Murphy questioned counsel about the school's pedagogical interest in controlling the appearance of the hallways, asking "But [the tile project] is pervasive in the sense that it is throughout the school .... And doesn't that reflect upon the pedagogical interests?" Appellees' counsel responded, "It, it does reflect upon pedagogical interests. I mean what [school officials] want the school to look like is certainly their business." (Oral Arg., 2/1/02, James R. Rouse, Sr.).

ing parents and rescue workers who responded to the shooting, does not make the tile project's purpose less of a pedagogical one. That is, so long as a pedagogical purpose is present, we do not believe that the existence of broader and consistent objectives, such as community involvement, should result in the loss of the proper pedagogical purpose. Indeed, many school-sponsored events include the participation of outside persons, whether it be a guest speaker, artist, or musician. Just because a school has invited these people into the school to participate in an event, such as a debate or panel discussion, should not mean that the school loses control of the message that is conveyed to the students.

### c. Reasonably Related to Legitimate Pedagogical Concerns

In creating the guidelines for the tile project, the District had two main pedagogical concerns in mind: (1) it wanted to ensure that the interior of the building remained a positive learning environment and not become a memorial to the tragedy (Ord., ¶ F-22), and (2) it wanted to avoid divisiveness and disruption from unrestrained religious debate on the walls.[13] Jon DeStefano, the school board president ultimately responsible for the board's general policy prohibiting religious symbols to be affixed permanently to school walls, testified that if the school allowed some religious symbols to be posted, it would open the door to all types of sentiments, including inflammatory ones, such as Nazi symbols. To the District, it was not just a question of permitting various mainstream

religious symbols, but of "opening all kinds of other doors" by doing so.[14]

Because the district court did not find the tile project to be "school-sponsored" speech under *Hazelwood*, it did not address whether the District's restrictions were reasonably related to these legitimate pedagogical concerns, but instead evaluated them under a limited forum analysis. The District ultimately relaxed the tile restrictions for the Plaintiffs, continuing to maintain only the prohibitions on the date of the shooting, religious symbols, and anything obscene or offensive. Only the first two of these restrictions were before the district court, and thus, those are the two restrictions we now address, measuring them against the District's legitimate pedagogical concerns.

The district court characterized the school's restriction on the date of the shooting as unreasonable because the District allowed the Plaintiffs to paint the name or initials of their child on the tiles, which would act as a reminder of the shooting as much as the date 4/20/99 would. We disagree. In weighing the competing interests of accommodating the victims' parents and preventing the tile project from becoming a memorial to the shooting, the District struck a reasonable balance. The *Hazelwood* standard does not require that the guidelines be "the most reasonable or the only reasonable limitation[s]," only that they be reasonable. *Hawkins*, 170 F.3d at 1287 (internal quotation marks omitted).

The fact that there are other references to the shooting in the school also does not render the District's restrictions on the tile

---

**13.** The District forecast that without the religious restriction, the walls could become a "situs of disruption, debate, and controversy that totally overwhelms and displaces the educational function of the building."

**14.** As pointed out at oral argument, under a traditional nonpublic forum analysis, which the Appellees urged as the appropriate analysis for the tile project, by allowing a tile stating "God is Love," the District would be obligated to post tiles stating "God is Hate."

project unreasonable. Those materials, which consisted primarily of a display case near the library, plaques and posters in the "administrative offices and/or other places inside CHS," and a sandstone memorial near the baseball field, constitute clear government speech. As an initial matter, this court has recognized that the government's own speech does not grant access to the public to speak on those topics. "If the government's own speech could be used to support a claim that it had thereby caused its facilities to become a public forum, then display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Brown v. Palmer*, 944 F.2d 732, 738 (10th Cir.1991) (en banc) (internal citations omitted), *aff'g* 915 F.2d 1455 (10th Cir.1990).

We perceive two main differences between the school's speech and the tile project, leading us to conclude that the presence of these memorials does not render the District's tile project restriction unreasonable. First, the tile project involves speech that is pervasive throughout the school. As opposed to isolated plaques in the office, or near the library, these tiles line the school halls, so that students constantly view them on their way to class. Second, the school retains control over the tone and manner of delivery of the speech that it chooses to display in the building. Aided by the advice of psychologists about how best to deal with the shooting, school officials could craft tasteful and appropriate memorials to the victims. The school

retained control over the parameters of this speech, as opposed to allowing student responses, which could be more inflammatory or judgmental. We think it is reasonable for the District to place a few memorials in the school without having to allow unconstrained, controversial student debate about the shooting throughout the hallways.

We also believe the District's restriction on religious symbols was reasonably related to a pedagogical interest. If the District had advanced only the purely legal reason of avoiding Establishment Clause liability as justifications for the restrictions on the tiles, then we would not give *Hazelwood* deference to that reasoning. *Roberts v. Madigan*, 921 F.2d 1047, 1057 n. 10 (10th Cir.1990). Because this court is "well-equipped" to evaluate constitutional reasons, we do not accord school districts asserting those reasons "the same deference as in other cases involving issues that school officials are uniquely qualified to handle." *Id.*

In this case, however, the District asserted two pedagogical reasons for its restriction on religious references: (1) religious references may serve as a reminder of the shooting, and (2) to prevent the walls from becoming a situs for religious debate, which would be disruptive to the learning environment.[15] We do not need to address the first reason because we find the latter of these to be reasonably related to the restriction on all religious symbols.[16]

Two courts recently have recognized a school's legitimate interest in avoiding religious controversy and disruption resulting from the posting of religious speech. In

---

**15.** The District expressed a desire to avoid a "controversy that totally overwhelms and displaces the educational function of the school building."

**16.** The district court specifically did not analyze whether this restriction was reasonable in light of the pedagogical reasons asserted, because it found that the restriction was not viewpoint neutral. *Fleming,* 170 F. Supp.2d at 1113 n. 5.

*DiLoreto,* the Ninth Circuit found the school district's decision to exclude advertisements on a baseball field fence "on certain subjects, including religion, was reasonable given the District's concerns regarding disruption and controversy." 196 F.3d at 969. The *DiLoreto* court found that because students were a "captive audience" at classes and school-sponsored events, the district's desire to avoid "controversy and distraction created by political and religious messages" on the fence was reasonable. *Id.* at 968. The court also noted the school district's concern that posting the religious speech, "would force [it] to open the forum to all expressions of personal beliefs." *Id.* The Seventh Circuit in *Gernetzke v. Kenosha Unified School District No. 1,* 274 F.3d 464 (7th Cir.2001), recognized similar concerns, upholding a principal's decision prohibiting a religious group's posting of a cross because he feared that allowing the cross "might also require him to approve murals of a Satanic or neo-Nazi character, which would cause an uproar." *Id.* at 466. Like these courts, we believe that the District's restriction on religious symbols was reasonably related to its legitimate goal of preventing disruptive religious debate on the school's walls.

## III. Conclusion

We conclude by noting that the *Hazelwood* analysis does not give schools unbridled discretion over school-sponsored speech. A number of constitutional restraints continue to operate on public schools' actions, such as the Establishment Clause, the Free Exercise Clause, the Equal Protection Clause, and substantive due process. In this case, the wisdom of the Supreme Court in *Hazelwood* of fashioning a separate analysis for school sponsored speech is obvious. If the District were required to be viewpoint neutral in this matter, the District would be required to post tiles with inflammatory and divisive statements, such as "God is Hate," once it allows tiles that say "God is Love." When posed with such a choice, schools may very well elect to not sponsor speech at all, thereby limiting speech instead of increasing it.[17] The District could be forced to provide an opportunity for potentially thousands of participants to repaint their tiles without any meaningful restrictions by the District, leading to a potentially disruptive atmosphere in which to try to educate the students of Columbine High School.

We REVERSE the judgment of the district court on the Plaintiffs' claim under the Free Speech Clause of the First Amendment, and find that the District's restrictions on the tile project were reasonably related to legitimate pedagogical concerns. Therefore, we VACATE the district court's injunction ordering the District to (1) provide an opportunity for the Flemings to paint the tiles they wished to paint but were precluded from painting and (2) mount the tiles painted by the Petrones and Rohrboughs. We REMAND this case for further proceedings consistent with this opinion.

---

17. *See generally Ark. Educ. Television Comm'n,* 523 U.S. at 681-82, 118 S.Ct. 1633 (stating that when institutions are forced to choose between "a cacophony on one the hand, and First Amendment liability, on the other," such a choice "does not promote speech but represses it").